

FILED

Jan 22 2019, 5:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT -
MOTHER

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEY FOR APPELLANT -
FATHER

Mark A. Thoma
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of L.N., Jr., a Child Alleged to be a Child in Need of Services; | January 22, 2019 |
| C.N. (Mother) and L.N., Sr. (Father), | Court of Appeals Case No. 18A-JC-1666 |
| *Appellants-Respondents,* | Appeal from the Allen Superior Court |
| v. | The Honorable Charles F. Pratt, Judge |
| Indiana Department of Child Services, | The Honorable Sherry A. Hartzler, Magistrate |
| *Appellee-Petitioner.* | The Honorable Lori K. Morgan, Magistrate |
| | Trial Court Cause No. 02D08-1706-JC-474 |

**Najam, Judge.**

## Statement of the Case

C.N. ("Mother") and L.N., Sr. ("Father") (collectively, "Parents") appeal the trial court's adjudication of their minor child, L.N., Jr. ("Child"), as a child in need of services ("CHINS"). Parents each present a single issue for our review, which we consolidate and restate as whether the trial court erred when it adjudicated Child to be a CHINS.

We reverse.

## Facts and Procedural History

In February 2017, Parents lived in Arizona. At that time, Parents were homeless, but they lived in an emergency family shelter because Mother was pregnant. On February 14, Mother gave birth to Child. When Child was approximately one month old, the family moved to Indiana. Shortly after Parents arrived in Indiana, they moved into a house and applied for Indiana's WIC program.[1] On WIC's referral, Parents engaged in services with Healthy Families and with the Hope Center. Parents also found a doctor for Child at the Neighborhood Health Clinic, where they took Child for Child's two-month checkup.

---

[1] WIC is a "food subsidy" program for newborn children. Appellee's Br. at 26. Mother applied to Indiana's WIC program because both Mother and Father are disabled and do not work. Mother became disabled after she had an allergic reaction to a prescription drug. Father became disabled after he was shot in the back in 1976.

[4] On June 8, the Indiana Department of Child Services ("DCS") received a report regarding concerns about Parents' mental health and their ability to care for Child. Specifically, the report indicated that Parents had stated that Child could walk, talk, and eat adult food, even though Child was only four months old. Further, the report indicated that Mother has bipolar disorder but that she was not taking her medications.

[5] That same day, a DCS employee went to Parents' house to ensure Child's safety. Parents denied the allegations, and the DCS worker did not see any visible marks or bruises on Child and did not observe any safety concerns with the home. The next day, DCS Family Case Manager ("FCM") Caitlin Wright went to Parents' house and spoke with Mother about Mother's health. Mother told FCM Wright that she had been previously diagnosed with bipolar disorder and that she had spent time in a psychiatric facility in 2009. Mother indicated that the psychiatric facility had released her with medications that she took for a while but that she had stopped taking them. Mother also told FCM Wright that, while Mother had tried to feed Child infant cereal on one occasion when Child was approximately two months old, Child did not like it, and Parents did not feed Child the infant cereal again. Rather, Mother stated that she was exclusively breastfeeding Child. Mother then signed consent forms to allow the Hope Center, Healthy Families, and the Neighborhood Health Clinic to release information to FCM Wright.

[6] FCM Wright then spoke with the service providers. Providers at the Hope Center and Healthy Families indicated that they had concerns with Parents'

lack of ability to parent, lack of supervision, and lack of knowledge regarding how to appropriately care for a child. Providers at the Neighborhood Health Clinic did not express any concerns. After FCM Wright had visited Parents' home a few times, she expressed concerns for Child's safety. In particular, FCM Wright was concerned that Parents did not recognize the safety concerns that Mother's mental illness can cause. Further, FCM Wright was concerned that Parents did not know how to soothe Child other than to breastfeed.

[7] Based on her concerns and the concerns of the providers at the Hope Center and Healthy Families, DCS removed Child from Parents' home on June 28. At the time Child was removed, Parents' home had trash and debris throughout; minimal furniture; loose screws, nails, lighters, and medication bottles; and there was a bottle full of urine in the living room.[2] Parents' home also lacked a showerhead in the bathroom. Accordingly, DCS filed a petition alleging Child to be a CHINS.

[8] The trial court held an initial hearing on June 30. After the hearing, the trial court entered a provisional order compelling Parents to engage in services. Shortly after DCS had removed Child from Parents' home, Parents began visiting with Child through Quality Counseling. The Parents initially started

---

[2] The bottle in the living room was "used for [Father] to urinate in." Father's App. Vol. 2 at 63. It is unclear whether Father's use of the bottle was related to his physical disability.

with regular visitations; Parents visited Child three times per week for three to four hours each time.

[9] Because Mother was breastfeeding Child at the time of Child's removal, Mother continued to pump breastmilk in order to take it to the visits with Child. Prior to visits, Mother would pump breast milk and freeze it. Then Mother would unfreeze it, add more milk, and freeze it again. Mother would repeat this process until it was time to bring the milk to the visit with Child. The Clinical Director of Quality Counseling, Rachida Bejja, informed Mother that that was not "appropriate storage" for the milk, especially since Mother did not label the milk. Tr. at 131.[3] Further, Parents had to walk "quite a distance" to the visits with Child, and they would carry the breastmilk to the visits. *Id.* at 148. But Parents would not put the milk in a cooler or any other container to keep it cold when they walked to the visits during the summer months. Once, Parents took milk to a visit that was "greenish" in color." *Id.* Because of her concerns with how Mother stored and transported breastmilk, Bejja recommended that Parents feed Child goat's milk as an alternative.[4] Parents agreed, and they bought Child goat's milk, which they stored in a refrigerator at Quality Counseling's facility.

---

[3] In the record on appeal, Parents provided two transcripts. One is the transcript of the factfinding hearings, and the other is a transcript of the dispositional hearing. As we do not cite to the transcript of the dispositional hearing in this opinion, for ease of reference, we refer to the transcript of the factfinding hearings simply as "Tr."

[4] Bejja had originally recommended feeding formula to Child. But Parents did not agree to using formula.

[10] On one occasion shortly after Child was removed from Parent's home, Mother took only baby food and water to feed Child.[5] Bejja attempted to talk to Mother and to tell her that Child also needed milk, but the conversation with Mother "escalat[ed]," and it was very difficult for Bejja to talk to Mother. *Id*. at 132. Based on her concerns with Mother's breastmilk and "food in general for the baby," and on her "difficulties communicating" with Parents, Bejja ultimately decided to change the visits from regular to therapeutic visits. *Id*. at 129.

[11] As a condition of their participation in services, Parents also submitted to psychological examinations. Doctor Jason Thomas Cook, a clinical psychologist, conducted the exams of Parents. During Mother's exam, Doctor Cook noted that Mother had "bizarre thought processes" and "eccentric behavior." *Id*. at 83. He also noted that Mother had a "lack of . . . concern about fitting in socially and what others think of her[.]" *Id*. Based on the results of Mother's exam, Doctor Cook concluded that Mother exhibited behaviors that were "consistent with someone with a personality disorder[,] specifically Schizotypal personality disorder[.]" *Id*. at 75. Doctor Cook also concluded that Mother has an "unspecified neurocognitive disorder," which "could interfere in parenting and understanding parenting skills[.]" *Id*. at 81.

---

[5] It is not clear from the record whether this incident occurred prior to or after the change from breastmilk to goat's milk.

He further concluded that her undiagnosed mental illness "could interfere in teaching . . . proper living skills" to Child. *Id.* at 83.

[12] Doctor Cook also conducted a psychological exam of Father. Based on the results of the exam, Doctor Cook determined that Father's "overall intellectual functioning" is "below the average" for a person in his peer group. *Id.* at 87. Doctor Cook further determined that Father's low intellectual functioning could make it difficult for Father to retain new information and "could" interfere in parenting. *Id.* at 88. Doctor Cook concluded that Father would struggle if he tried to live alone. Doctor Cook recommended that Father receive further neuropsychological testing and possibly psychiatric services.

[13] The trial court held factfinding hearings on the CHINS petition on October 18 and November 30, 2017, and on February 21, 2018. On May 14, the trial court entered findings of fact and conclusions thereon in which it found Child to be a CHINS. Specifically, the trial court found that

> [Child's] parents are likely suffering from significant neurocognitive disorders and his mother suffers from a personality disorder. The parents' mental health disorders interfere with their ability to appropriately care for and parent the child. Their mental health disorders prohibit them from having an awareness of their own needs as well as their child's daily needs and cause them to experience bizarre and delusional thoughts[,] which interferes with their ability to provide for themselves and their child. They have, at times, been hesitant or reluctant to follow the recommendations of service providers because they are not used to doing things the way the services providers are recommending that they do them. They have, at times, behaved inappropriately in the presence of the service

providers and others. They were voluntarily participating in some services prior to the initiation of the CHINS proceedings[;] however, there were still concerns about the parents' ability to provide for themselves and their child even after receiving those services.

Mother's App. Vol. 2 at 27. The court then held a dispositional hearing on June 13, 2018. This appeal ensued.

## Discussion and Decision

Parents contend that DCS failed to present sufficient evidence to demonstrate that Child is a CHINS. Our Supreme Court has set out our standard of review:

> When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). "Instead, we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom." *Id.* at 1287 (citation, brackets, and internal quotation marks omitted). When a trial court supplements a CHINS judgment with findings of fact and conclusions of law, we apply a two-tiered standard of review. We consider, first, "whether the evidence supports the findings" and, second, "whether the findings support the judgment." *Id.* (citation omitted). We will reverse a CHINS determination only if it was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). A decision is clearly erroneous if the record facts do not support the findings or "if it applies the wrong legal standard to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (citation omitted).

*Gr. J. v. Ind. Dep't of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 577-78 (Ind. 2017) (alterations in original).

[15] DCS alleged that Child was a CHINS pursuant to Indiana Code Section 31-34-1-1 (2018), which provides that a child is a child in need of services if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[16] Our Supreme Court has interpreted that statute to require "three basic elements: that the parent's actions or inactions have *seriously endangered the child*, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287 (emphasis added). "A CHINS adjudication focuses on the condition of the child." *N.L. v. Ind. Dep't of Child Servs. (In re N.E.)*, 919 N.E.2d 102, 105 (Ind. 2010). And, when determining whether a child is a CHINS under Section 31-34-1-1, the juvenile court "should consider the family's condition not just when the case was filed, but also when it is heard." *In re S.D.*, 2 N.E.3d at 1290.

[17] Here, Parents contend that the trial court erred when it adjudicated Child to be a CHINS because there was no evidence that: Child was seriously endangered by Parents' actions or inactions; Child's needs were unmet; or Child's needs would go unmet in the absence of coercive intervention of the court. In response, DCS first contends that Child is a CHINS because Parents have

"unaddressed mental health and health issues[.]" Appellee's Br. at 29. In support of that contention, DCS presented evidence to the trial court that Mother has been diagnosed with bipolar disorder but does not take medication and that Mother also exhibits behaviors that are "consistent with someone with a personality disorder[,] specifically Schizotypal personality disorder[.]" Tr. at 75. DCS also presented the testimony of Doctor Cook, who testified that Mother's undiagnosed mental health issues "*could* interfere in parenting and understanding parenting skills[.]" *Id*. at 81 (emphasis added). In addition, DCS presented evidence that Father has a low intellect and that Father's low intellect "*could* interfere [in] parenting[.]" *Id*. at 88 (emphasis added).

[18] We must conclude that evidence of Mother's mental health issues and Father's low intellect, without more, does not demonstrate that Child has been seriously endangered for purposes of Indiana Code Section 31-34-1-1. Again, it is well settled that a "CHINS adjudication focuses on the condition of the child." *In re N.E.*, 919 N.E.2d at 105. Here, DCS did not present any evidence relevant to the actual impact, if any, of Mother's mental illness or Father's low intellect on Child's safety. That is, while various service providers testified that Mother's mental illness and Father's low intellect could interfere with their ability to parent Child, DCS did not present any evidence to indicate that Mother's mental illness or Father's low intellect actually did, or was even likely to, seriously endanger Child. *See In re S.D.*, 2 N.E.3d at 1287. Rather, the testimony of the service providers amounted to speculation about parenting issues that may or may not materialize in the future.

[19]     We understand that Mother's mental illness and Father's low intellect may be a cause for concern for DCS. But a cause for concern is not the touchstone of a CHINS determination, and an unspecified concern about what might happen in the future is insufficient in itself to carry the State's burden of proof. Indeed, future concerns rather than present facts are not enough to support a CHINS determination. *See J.J. v. Ind. Dep't of Child Servs. (In re K.S.)*, 78 N.E.3d 740, 745 (Ind. Ct. App. 2017). Rather, in order to prove that Child is a CHINS, DCS was required to present evidence that Parents' actions or inactions have seriously endangered Child. That is to say, DCS was required to present evidence that there is a nexus between either Mother's mental health or Father's intelligence and Child's actual endangerment. But DCS did not present any such evidence. Without any specific evidence that Mother's mental illness or Father's low intellect presented a serious danger or a likelihood of serious endangerment to Child, we must conclude that DCS failed to present evidence sufficient to support this purported basis for the CHINS determination.

[20]     Still, DCS also alleged that Child is a CHINS because: Parents had previously lived a "transient lifestyle"; their home is not suitable for young children; and because Parents struggle with knowing what Child should eat. Appellee's Br. at 27. There is no dispute that, at the time DCS filed the CHINS petition, Parents had previously been homeless and had had a problem maintaining a clean home suitable for a small child. There is also no dispute that Parents had problems with the storage and transportation of breast milk and, on one occasion, with feeding Child only baby food and water.

[21]     However, when determining whether a Child is a CHINS under Section 31-34-1-1, as is the case here, courts "'should consider the family's condition not just when the case was filed, but also when it is heard.'" *In re D.J.*, 68 N.E.3d at 580 (quoting *In re S.D.* at 1290 (citation omitted)). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581. In other words, in a CHINS case, we give special consideration to a family's current conditions.

[22]     And, here, the facts demonstrate that, at the time of the fact-finding hearing, Parents had resolved their prior issues with transience and cleanliness. While DCS had indicated concerns with the suitability and cleanliness of Parents' home when it filed the CHINS petition, the undisputed evidence demonstrates that, since Child was removed from the home, a service provider has been "teaching the [P]arents better ways to clean and maintain the home." Appellee's Br. at 26. Indeed, when FCM Wright visited the house, it was "cluttered," but the condition of the home did not cause her any concerns. Tr. at 116. And even DCS concedes that, "[b]y the time of the most recent inspection[,] the home met minimal standards." Appellee's Br. at 8. Further, Parents had moved into their house in March of 2017, and they continued to live in the home at the time of the hearing.

[23]     Additionally, by the time of the fact-finding hearing, Parents had solved the problems related to the transportation and storage of breastmilk when they agreed to feed Child goat's milk, which they store in Quality Counseling's

refrigerator and which Child "loves" and "seems to tolerate . . . well."[6] Tr. at 54. Indeed, Parents had solved the problems related to the use and transportation of breastmilk "shortly" after DCS first discussed the issue with Parents. *Id*. at 179. Further, by the time of the fact-finding hearing, Parents had solved the problem related to feeding Child only baby food and water. The DCS liaison at Quality Counseling testified that Parents had since engaged in parenting classes with a therapist once a week, which classes included information regarding food and "food safety." *Id*. at 146. And, although it took Parents "a while . . . in the . . . food safety category[,]" Parents have "come along . . . well." *Id*.

[24] It is well settled that "a CHINS adjudication may not be based solely on conditions that no longer exist." *S.S. v. Ind. Dep't of Child Servs. (In re R.S.)*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013). Parents' prior homelessness, their unsafe home conditions, and their problems feeding Child inappropriate food or unsafe breastmilk are all conditions that no longer existed at the time of the factfinding hearing. Accordingly, we cannot say that DCS presented sufficient evidence to support a CHINS determination.

---

[6] In its brief on appeal, DCS contends that, on one occasion, Mother "had to be stopped from giving Child expired [goat's] milk." Appellee's Br. at 27. But that contention is not supported by the record. There is no evidence that Mother fed Child expired milk. Rather, Bejja testified that "the milk was fed to the baby after it's expiring [sic] four or five days expired so I did have an emergency meeting with my staff . . . to instruct them to be super careful about that and we throw out the milk." Tr. at 132. Bejja's testimony does not make clear that Mother was the one who fed Child expired milk on that occasion or that Mother even knew the milk had expired. Moreover, that evidence does not demonstrate that the milk was necessarily unsafe.

We acknowledge that the CHINS statutes do not require the juvenile court and DCS to wait until a child is physically or emotionally harmed to intervene. But the CHINS finding must be based on facts and reasonable inferences from the facts, not on future concerns. And it was DCS's burden to prove that Parents' actions or inactions have seriously endangered Child. *See In re N.E.*, 919 N.E.2d at 105. Here, DCS did not present any evidence that Child was seriously endangered as a result of Parents' mental health, actions, or inactions. *See In re B.N.*, 969 N.E.2d at 1026. We therefore hold that the trial court erred when it found Child to be a CHINS, and we reverse the trial court's judgment.

Reversed.

Pyle, J., and Altice, J., concur.