## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 15 2019, 6:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel Hageman
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

C.M. *(Minor Child), Child In Need Of Services*

and

J.M. *(Mother)*

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

July 15, 2019

Court of Appeals Case No.
19A-JC-132

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Danielle Gaughan, Magistrate

Trial Court Cause No.
49D09-1809-JC-2284

**Robb, Judge.**

# Case Summary and Issue

[1] J.M. ("Mother") appeals the juvenile court's finding that her son, C.M., is a child in need of services ("CHINS"). Mother raises two issues on appeal, which we consolidate and restate as: whether the Marion County Department of Child Services ("DCS") presented sufficient evidence to establish that C.M. was seriously impaired or endangered by Mother's actions or inactions. Concluding that DCS failed to present sufficient evidence that C.M.'s physical or mental condition was seriously impaired or endangered as a result of Mother's inability, refusal, or neglect to supply C.M. with necessary food, clothing, shelter, medical care, treatment, or rehabilitation, we reverse the CHINS adjudication.

# Facts and Procedural History

[2] Mother is the biological mother of C.M., born January 13, 2009.[1] C.M. has been diagnosed with ADHD. Mother has been diagnosed with bipolar disorder type I, post-traumatic stress disorder, and ADHD.

## I. Previous CHINS Adjudication

[3] DCS first become involved with Mother and C.M. in July 2011, and then again in March 2016. On April 26, 2016, DCS filed a petition alleging C.M. to be a

---

[1] K.J., C.M.'s biological father, could not be located, was defaulted, and does not participate in this appeal.

CHINS. An initial hearing was held, and the juvenile court ordered C.M. to be removed from Mother's care. The court adjudicated C.M. a CHINS on July 25, 2016, upon Mother's admission that the "family would benefit from continued state assistance to maintain stable housing and to ensure that the child's educational and therapeutic needs are met; therefore, the coercive intervention of the Court is necessary." Exhibit Volume I at 57-58. Mother was ordered to participate in homebased case management, a psychological evaluation, and ongoing mental health treatment. By December 5, 2016, Mother was complying with the ordered services, had moved into a new home, and the case was moving toward a temporary trial home visit. On February 22, 2017, the juvenile court terminated wardship after reunification between Mother and C.M. had been achieved.

# II. Current CHINS Adjudication

[4]     DCS involvement for the instant case began on September 9, 2018. Mother and then nine-year-old C.M. were at their home when police arrested Mother for an outstanding warrant. While at Mother's home, the police called DCS over their concern that C.M. would be left without a caregiver once Mother was taken into custody. DCS investigator Yolanda Roland-Powell arrived on scene and spoke with Mother about a plan for C.M.'s care. Roland-Powell took Mother's recommendation about who could care for C.M., and C.M. was initially placed with the caregivers who Mother recommended. However, DCS removed C.M. after two days because those caregivers informed DCS that they would not continue to care for C.M. C.M. was subsequently placed in foster care.

On September 13, 2018, DCS filed a verified petition alleging C.M. to be a CHINS. The petition alleged that C.M. was a CHINS, as defined in Indiana Code section 31-34-1-1, and read in relevant part as follows:

> **Inability, Refusal or Neglect, I.C. 31-34-1-1:** The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and the child needs care, treatment, or rehabilitation that the child is not receiving; and is unlikely to be provided or accepted without the coercive intervention of the Court.
>
> [Factual Allegations:]
>
> a.    [Mother] has failed to provide the child with a safe, stable, and appropriate living environment.
>
> b.    [Mother] was recently arrested and incarcerated leaving [C.M.] without a legal, appropriate caregiver to provide him with basic care and necessities.
>
> c.    [Mother] struggles with mental health issues that seriously hinder her ability to care for [C.M.], and she has been exhibiting behaviors that suggest her mental health issues are not adequately being treated.
>
> d.    [C.M.] disclosed he does not get enough food to eat.
>
> e.    The family has a history with [DCS] due to substance abuse and mental health issues, and services were offered through a prior [CHINS] action.

f.    Despite prior services offered, [Mother] continues to demonstrate an inability to provide [C.M.] with a safe, stable home, and [C.M.] and family are in need of services they are not receiving and are unlikely to receive without the DCS' and the Court's involvement.

*****

i.    Due to the foregoing reasons, the coercive intervention of the Court is required to ensure [C.M.'s] safety and well[-]being.

Appellant's Appendix, Volume II at 33-34.  The petition also noted that C.M. had been removed from Mother's care.

[6]    That same day, the juvenile court conducted an initial hearing.  Mother was out of custody and appeared for the hearing.  The court ordered (among other things) the continued removal of C.M. from Mother's care and ordered DCS to provide Mother with any services in which she was willing to participate.

[7]    The juvenile court held a factfinding hearing on two separate days, October 29, 2018 and November 19, 2018.[2]  On November 19, 2018, at the conclusion of the hearing, the court adjudicated C.M. a CHINS.  On November 28, 2018, the court entered a written order that contained the following findings regarding its CHINS determination:

---

[2] Mother's attorney requested, and the juvenile court granted, an additional day for the factfinding hearing so that Mother could present witnesses that were not available on the first day of the hearing.

1.      [C.M.] is a minor child whose date of birth is January 13, 2009.

2.      The mother of [C.M.] is [J.M.] (Mother).

3.      The father of [C.M.] is [K.J.] (Father).

4.      The whereabouts of Father are unknown and he is set for a default hearing on January 7, 2019 at 1:30 PM.

5.      A child in need of services petition was filed on September 13, 2018, because Mother was arrested on or about September 9[,] 2018 leaving [C.M.] without a caregiver. The DCS [investigator], Yolanda Rowland-Powell was called to Mother's home and Mother was being arrested. Mother was very rude and was speaking over Ms. Rowland-Powell and the police officer. Ms. Rowland-Powell was trying to obtain information from Mother regarding possible placements for [C.M.] but the person Mother suggested could not keep [C.M.]. [C.M.] was therefore removed and placed in foster care.

6.      An initial hearing was held on September 13, 2018 and the Court ordered the continued removal of [C.M.] from Mother's care. By the time of the initial hearing Mother had been released from jail and appeared at the initial hearing. After the initial hearing Mother was loud and disruptive in the hallway yelling "When can I see my kid; when can I see my f***ing kid?" The assigned [family] case manager ["FCM"], Brandi Whitaker, was concerned for her own safety after the initial hearing and an officer walked her to her car. Mother was yelling at Ms. Whitaker in the parking lot as she went to her car. Mother has since left belligerent, rude and vulgar voicemails for FCM Whitaker.

7. On September 16, 2018, Mother was at the hospital and was being loud and disruptive. Mother was reporting that her boyfriend had hit her in the head with a pipe. Mother called one of the nurses a "millennial c***." Hospital staff was working to subdue and medicate Mother and she kicked a charge nurse and also kicked a police officer in the ribs. Mother required arm and leg restraints because of her violent demeanor. As a result of this incident, Mother was charged with Battery on an Officer and Disorderly Conduct.

8. Mother does not have stable housing. After Mother was released from jail, a team meeting was held and Mother requested visits with [C.M.] in her home. The team had no objection to visits in Mother's home so long as a home check found the home to be appropriate. When DCS went to check the home, the home did not have a working furnace and Mother had to be out of the home in five hours.

9. Mother has been aggressive and threatening toward people in the community. Mother was attending City View Christian Center until she threatened a previous head pastor and he dismissed her. A new pastor, Chad Fulkerson, allowed Mother back into the church, at the request of Mother's husband, but Mother began threatening the new pastor as well. The church has an 18[-]month in[-]house drug treatment program called SWAT (servant with a testimony) that Mother's husband, [R.W.], participated in. Mother threatened to shoot up the SWAT house. Mother told the new pastor that people in the neighborhood would lynch him and that his family and congregation were in danger. Mother has also threatened to kill herself and has told the pastor that she would frame him for her murder.

10. Mother has disclosed that she has been diagnosed bipolar but that she does not believe that. Mother thinks that she is

possessed by a demon.  Mother has stated that she self-medicates with THC and will not take "man's medicine."

11.     Mother has also threatened a member of the City View Christian Church.  Mother has left him voicemails that are rambling, threatening and vulgar stating, in part, "Tell your f***ing c*** leader you guys are a cult; you are f***ing child molesters.  You are cool aid drinking, d*** sucking child molesters.  You can suck my fat a** and the horse it rode in on . . . b****.  Tell him [pastor] that I will f*** him up if [R.W.] [her husband] relapses.  I'm going to f*** him up."

12.     Mother's testimony at trial was rambling, often non-responsive, and very difficult to follow.  Mother stated that she is not a member of the City View Christian Church but her husband has been for the last twelve years.  Mother stated that the recent change of pastors has been bad for the church and she does not get along with him.  Mother stated that [P]astor Fulkerson hid her husband in the church and that her husband was brainwashed through the church.  Mother stated that the church helped her husband get clean through their drug treatment program but that the church "is in cahoots".  Mother stated that it was one of Pastor Fulkerson's "cronies" that hit her in the back of the head and sent her to the hospital and denies telling the nurse at the hospital that her husband hit her.

13.     Mother has a history with DCS because of her mental health issues that seriously hinder her ability to care for [C.M.].  Mother's recent behaviors demonstrate that her mental health issues are not being adequately treated.

14.     The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal or neglect of the child's parent to supply the child with necessary food, clothing, shelter, medical care, education or

supervision. By her own admission[,] Mother has mental health issues but does not want to take medication. Mother has repeatedly exhibited threatening and volatile behaviors. She has acted aggressively toward a church pastor, community members, hospital staff, law enforcement and her DCS case manager.

15. The child needs care, treatment or rehabilitation the child is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court. Mother is volatile and uncooperative and is unlikely to receive the services she requires without the coercive intervention of the Court.

Appellant's App., Vol. II at 89-92.

[8] On December 17, 2018, the court held a dispositional hearing and issued an order that same day. The order provided in relevant part as follows:

[P]ursuant to this dispositional decree . . . it is in the best interests of [C.M.] to be continued removed [sic] from the home environment and remaining in the home would be contrary to the welfare of the child because:

• the allegations [are] admitted or found to be true.

• the child has special needs that require services for care and treatment that cannot be provided in the home[.]

*Id.* at 95. The order also provided the following regarding Mother:

The Court finds a rational basis for Mother to participate in [a homebased counseling program ("HBCM")], screens, a psychological evaluation, and a substance abuse assessment in the event Mother screens positive or misses screens and in

support.  Additionally, the Court orders Mother to sign the necessary release of information so that DCS can obtain Mother['s] mental health records from the Hamilton Center.  In support of the foregoing, the Court finds the following:

1. Mother has agreed there is a rational basis for the HBCM.  Additionally, Mother would benefit from the assistance of HBCM to obtain and maintain stable housing.

2. Mother has prior DCS involvement because of mental health issues and her recent volatile and aggressive behaviors are evidence of ongoing untreated mental health issues and therefore Mother would benefit from a psychological evaluation.

3. There have been concerns that Mother is abusing alcohol and uses marijuana to [self-medicate] and therefore the random drug screens will monitor Mother's sobriety.

*Id.* at 97.  Mother now appeals.  Additional facts will be provided as necessary.

# Discussion and Decision

## I.  Standard of Review

Mother challenges the sufficiency of the evidence to support the CHINS determination.  She contends that DCS failed to establish that C.M. was seriously impaired or endangered by her actions or inactions.  We agree.

When reviewing the sufficiency of evidence, we give due regard to the trial court's ability to assess the credibility of witnesses.  *In re Des.B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014).  We neither reweigh evidence nor judge witness

credibility; rather, we consider only the evidence and reasonable inferences most favorable to the trial court's decision. *Id.* Where the trial court issues findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.P.*, 949 N.E.2d 395, 400 (Ind. Ct. App. 2011). We consider first whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *K.B. v. Ind. Dep't of Child Servs.*, 24 N.E.3d 997, 1001-02 (Ind. Ct. App. 2015) (citation omitted). "A judgment is clearly erroneous if it relies on an incorrect legal standard." *Id.* at 1002.

[11]    In a CHINS proceeding, DCS bears the burden of proving by a preponderance of the evidence that a child meets the statutory definition of a CHINS. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). In the instant case, to meet its burden of establishing CHINS status, the State must prove that the child is under age eighteen,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

> (2) the child needs care, treatment, or rehabilitation that:

> (A) the child is not receiving; and

> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1. Our supreme court has interpreted the statute to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[12] Although the acts or omissions of one or both parents can cause a condition that creates the need for court intervention, the CHINS designation focuses on the condition of the child rather than on an act or omission of the parent(s). *In re N.E.*, 919 N.E.2d at 105. In other words, despite a "certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that—a determination that a child is in need of services." *Id.* When determining whether a child is a CHINS under Indiana Code section 31-34-1-1, the juvenile court "should consider the family's condition not just when the case was filed, but also when it is heard." *In re S.D.*, 2 N.E.3d at 1290.

## II. Sufficiency of the Evidence

[13] Mother argues that DCS presented insufficient evidence to establish that her "mental health and perceived lack of housing . . . seriously endanger[ed] or impair[ed] C.M." Brief of Appellant at 16. She also challenges four of the

juvenile court's factual findings as being "misleading or not supported by the evidence[,]" namely that, (1) she did not have stable housing; (2) she yelled at or made threatening gestures toward FCM Whitaker; (3) she does not believe she suffers from bipolar disorder and she self-medicates with marijuana; and (4) C.M. has needs that are unlikely to be addressed without coercive intervention of the court. *Id.* at 14. DCS maintains that the record supports the factual findings that Mother challenges and that her arguments to the contrary are requests to this court to reweigh the evidence, which we cannot do. According to DCS, the juvenile court did not err in adjudicating C.M. a CHINS because "Mother had unresolved mental health issues[; h]er actions both before and during the CHINS case showed that she was not getting treatment, and even if she was, it was not effective[; and] . . . Mother battered a nurse and a police officer, kicking them violently when they were trying to treat her." Brief of Appellee at 17. We conclude that the evidence in this case of Mother's mental health issues, *allegations* of self-medication with marijuana, her one-time move from a home with a faulty furnace to a motel, and her abrasive and (at times) combative behavior, without more, does not establish a sufficient nexus between Mother's actions or inactions and any actual endangerment to C.M. to demonstrate that C.M. has been seriously endangered for purposes of Indiana Code section 31-34-1-1.

[14] Jeanette Strong, a care manager at Hamilton Center in Plainfield, testified that at the time of the factfinding hearing, Mother was voluntarily engaged in a treatment program for her diagnoses for bipolar disorder type I, post-traumatic

stress disorder, and ADHD; and, she was taking prescribed medication. Strong further testified that she works with Mother on parenting skills, emotional regulation, and social skills, and that she also helps ensure that Mother takes her prescribed medication by requiring her to submit to tests administered during doctor appointments. FCM Whitaker testified that Mother's behavior gave her concern about whether Mother's mental health issues are being treated properly. However, no evidence was presented that C.M. was seriously impaired or endangered by Mother's mental health issues. *See, e.g., L.N. v. Ind. Dep't of Child Servs. (In re L.N.)*, 118 N.E.3d 43, 49 (Ind. Ct. App. 2019) ("We understand that Mother's mental illness . . . may be a cause for concern for DCS. But a cause for concern is not the touchstone of a CHINS determination, and an unspecified concern about what might happen in the future is insufficient in itself to carry the State's burden of proof.").

[15]     FCM Whitaker also testified that she questioned whether Mother had stable housing. She noted that Mother left her previous home because it did not have a furnace and that she was living in a motel while transitioning to a new home. However, no evidence was presented that FCM Whitaker had visited either dwelling, and she did not present testimony regarding how the one-time move from the home to the motel seriously impaired or endangered C.M. Mother testified that she moved out of her previous home because the landlord did not properly maintain the furnace, and that she was living at the motel while she looked for an apartment. Mother also testified that the motel room included,

among other things, heat, two rooms with separate beds, one of which could be C.M.'s, a refrigerator, hotplate, microwave, and crockpot.

[16]   DCS alleged in its CHINS petition that C.M. was "not get[ting] enough food to eat[,]"[3] and FCM Whitaker testified at the factfinding hearing that "it's alarming to me that [C.M.] states he does not want to see [Mother]." Appellant's App., Vol. II at 33; Transcript of Evidence, Volume II at 53.  While testimony was presented at the factfinding hearing regarding whether Mother could provide C.M. with healthy meals, no evidence was presented that indicated C.M. was insufficiently nourished.  Also, there was no evidence presented to explain why C.M. did not want to see Mother.

[17]   Regarding Mother's profane behavior, there is scant evidence in the record regarding how the behavior endangered C.M.  The only evidence presented on this matter was Pastor Fulkerson's recollection that "[C.M. has] been at the church before – when [Mother has] gotten loud and crazy with people." Tr., Vol. II at 39-40.

[18]   With respect to Mother's marijuana use and alcohol consumption, evidence was presented at the factfinding hearing that Mother might have used

---

[3] The allegations that C.M. was not receiving a sufficient amount of food stem from DCS's preliminary investigation that included an interview that DCS investigator Rowland-Powell conducted with C.M. in September 2018.  During the interview, C.M. told the investigator that he "does not receive enough food to eat." Appellant's App., Vol. II at 15.  However, C.M. also told the investigator that he "feels safe at home[.]" *Id.*  There was no follow-up investigation, in as much as C.M. did not seem to exhibit physical markers of malnutrition.

marijuana to self-medicate and perhaps consumed alcohol in excess. FCM Whitaker testified that "[i]n all of the allegations that have been called in, there are *references* to either alcohol abuse or drug abuse and based on [Mother's] behavior – her erratic behavior, it would *leave me to believe* that [Mother is] *possibly* using substances." *Id.* at 57 (emphasis added). Evidence was presented that Mother might have been intoxicated when she arrived at the hospital due to the alleged head injury, and FCM Whitaker noted at the dispositional hearing that Pastor Fulkerson testified, and C.M. "has stated[, that] occasionally . . . [Mother drinks] excessively." *Id.* at 105. However, no evidence was presented regarding when, where, or how many times C.M. had seen Mother use marijuana or consume alcohol in excess. And, there is nothing in the record to show that Mother ever used marijuana in C.M.'s presence. *See, e.g., Ad.M. v. Ind. Dep't of Child Servs.*, 103 N.E.3d 709, 714 (Ind. Ct. App. 2018) (children were not CHINS despite Mother's history of sporadic marijuana use because there was no evidence that, at any point and time, any of the children were endangered, that the parents had ever used drugs in the presence of the children, or that there was ever an occasion in which the parents were impaired by substance abuse while the children were in their care).

[19] The only evidence that C.M. might have needed treatment was regarding his diagnosis of ADHD. While conflicting evidence was presented as to whether C.M. had consistently taken medication in the past for his ADHD, FCM Whitaker testified at the factfinding hearing that there was no current recommendation for C.M. to take any medication for his ADHD. Also, no

evidence was presented that Mother failed to administer prescribed medication to C.M. for his ADHD.

[20] Here, while the facts established that Mother was undergoing treatment for mental health issues, exhibited rude, aggressive, and at times combative behavior, used profanity, had problems with her living arrangements, *may* have self-medicated with marijuana, and displayed an attitude toward DCS staff and services that was less than obsequious and was at times hostile, this did not relieve the State of its burden to prove by a preponderance of evidence that C.M. was endangered by Mother's actions or inactions. DCS did not present sufficient evidence to support a reasonable inference that Mother's actions or inactions harmed C.M. in any way or prevented her from providing for C.M.'s needs, or that C.M.'s needs would go unmet without coercive court intervention. Mother may have acted and/or reacted badly towards *other people* but no evidence was presented that she behaved poorly toward C.M. Without evidence in the record of the impact of Mother's problems on C.M., the determination that C.M. was seriously endangered by Mother's actions or inactions is speculation. We therefore conclude that the juvenile court's determination that C.M. is a CHINS was clearly erroneous.

# Conclusion

[21] Based on the foregoing, we find that DCS presented insufficient evidence to establish by a preponderance of the evidence that C.M. was a CHINS.

Accordingly, we reverse the juvenile court's adjudication that C.M. is in need of services.

[22]     Reversed.

Baker, J., and Najam, J., concur.