

**FILED**

Apr 01 2019, 6:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of A.R., A.S., L.S., and J.O., Children Alleged to be Children in Need of Services; | April 1, 2019 |
| | Court of Appeals Case No. 18A-JC-2523 |
| M.O. (Mother), | |
| *Appellant-Respondent,* | Appeal from the Tippecanoe Superior Court |
| v. | The Honorable Faith A. Graham, Judge |
| | The Honorable Tricia L. Thompson, Juvenile Magistrate |
| Indiana Department of Child Services, | Trial Court Cause Nos. 79D03-1806-JC-173 |
| *Appellee-Petitioner.* | 79D03-1806-JC-174 79D03-1806-JC-175 79D03-1806-JC-176 |

**Najam, Judge.**

# Statement of the Case

M.O. ("Mother") appeals the trial court's adjudication of her four minor children, A.R., A.S., L.S., and J.O. (the "Children"), as children in need of services ("CHINS"). Mother raises a single issue for our review, which we restate as whether the trial court erred when it adjudicated the Children to be CHINS.[1] We conclude that the evidence does not support the CHINS determination that the coercive intervention of the court is required to protect the Children. Accordingly, we reverse.

# Facts and Procedural History

In June 2018, Mother was pregnant and living at her parents' house. At that time, Mother had three children: A.R., born February 18, 2007; and A.S. and L.S., born March 9, 2015. On June 15, Mother's parents informed her that she could no longer live at their house. That same day, Mother checked into a hospital and gave birth to her fourth child, J.O. Shortly after J.O.'s birth, the hospital tested J.O.'s cord blood, which tested positive for methamphetamine.

While Mother was still at the hospital, Indiana Department of Child Services ("DCS") Family Case Manager ("FCM") Andrea Woodard spoke with Mother about Mother's living situation. Mother admitted that she was not sure where she was going to live when she left the hospital. FCM Woodard also asked Mother about the presence of methamphetamine in J.O.'s cord blood. Mother

---

[1] The Children's respective fathers do not participate in this appeal.

told FCM Woodard that she did not know how methamphetamine got into J.O.'s system, but that it "could've gotten there from being around a friend" who was using methamphetamine for approximately thirty minutes. Tr. Vol. II at 12. After her conversation with Mother, FCM Woodward determined that an emergency existed and removed the Children from Mother's care "on the spot." *Id.*

[4] On June 20, DCS filed a petition alleging that the Children were CHINS. Specifically, DCS alleged that the Children were CHINS due to Mother's homelessness. DCS additionally alleged the J.O. was a CHINS because she had been born with methamphetamine in her system. The next day, Mother, A.R., A.S., and L.S. submitted to a hair follicle test. Mother, A.S., and L.S. all tested positive for methamphetamine, with Mother's level being "fatal." *Id.* at 98.

[5] The trial court held an initial hearing on the CHINS petition. During that hearing, the trial court ordered Mother to submit to drug tests. The court also approved Mother's participation in parenting time if her drug tests came back negative but ordered visitations to stop should Mother test positive.

[6] After DCS removed the Children from Mother's care, DCS offered Mother case management and visitation services. Mother met with her case manager, Molly Craig, once per week and was doing "well." *Id.* at 20. Mother also regularly

participated in visitation with the Children.[2] Mother visited with the Children three days per week for two and one-half to three and one-half hours per visit.

[7] The trial court held a fact-finding hearing on the CHINS petition on August 17 and 20. During the fact-finding hearing, DCS presented evidence that, in 2009, Mother, who is a registered nurse, had been convicted of possession of a controlled substance, as a Class C felony, after she had stolen prescription pain pills from patients. DCS also presented as evidence the results of the June 21 hair follicle test, which results indicated that Mother had tested positive for methamphetamine on that date. DCS also called Nathan Elkins, an employee in the permanency department of DCS. Elkins testified that, during one random drug screen, Mother admitted that she had used methamphetamine while she was pregnant with J.O. and that the last time she had used methamphetamine was approximately one month prior to J.O.'s birth. Other than the June 21 hair follicle test, DCS did not submit as evidence the result of any other drug test during the fact-finding hearing. Rather, at the dispositional hearing, Elkins testified that Mother was "testing negative for everything" but her prescriptions and that she had not tested positive for methamphetamine "since the start of the case." *Id*. at 127.

[8] Elkins also testified regarding the visits between Mother and the Children. Elkins testified that the visits have been "outstanding . . . every time." *Id*. at 20.

---

[2] Mother missed "a couple" of visits with Children due to "scheduling issues with her visit facilitator." *Id*. at 21. But DCS "switched over to a new visit facilitator and things have gone well since then." *Id*.

Elkins stated that he "never had concerns" during any of the visits that he had supervised and that the Children "are very, very bonded to" Mother. *Id.* at 20-21. Further, Marcus Jackson, who took over supervising Mother's visitation with the Children on August 1, testified that the visits between Mother and the Children "are going really, really great" and that Mother is "doing very well" with the Children. *Id.* at 105. He further testified that Mother is "parenting and providing everything they need" such as "bottles, food, . . . all those things, and just . . . bonding." *Id.* He also testified that Mother does "a great job" at multitasking between the Children. *Id.* Jackson further testified that Mother has never appeared to be under the influence at any of the visits and that he had not had any concerns about Mother's visits with the Children.

[9]     Mother also testified during the fact-finding hearing. Mother admitted that she had been homeless since June. But she also testified that she had signed a lease on a new condo the day before the hearing and that she would be moving into the condo that night. Mother also testified that she had everything the Children needed in the condo, that Transitional Housing had inspected her new condo, and that the condo was safe and appropriate for the Children. Additionally, Mother testified that she had recently accepted a new full-time nursing position, which was scheduled to begin on September 10. Mother acknowledged that the new position was contingent upon her passing a background check and drug screen. But Mother testified that her new employer already knew about her prior conviction in 2009 and that she had not had any other criminal convictions since that date.

[10] During her testimony, Mother admitted that, prior to her 2009 conviction, she had used pain pills and developed an opiate habit. She further admitted that she had started using methamphetamine in August 2017 and that she had used methamphetamine while pregnant with J.O. But Mother also testified that she had obtained counseling without the assistance of DCS for "methamphetamine use in remission" and that she had been seeing her therapist once per week for four weeks.[3] *Id*. at 62.

[11] Mother also called Craig as a witness. Craig testified that, as Mother's case manager, she had met with Mother once per week and that Mother was cooperative with her services and proactive with the goals that they had set. Craig further testified that Mother made Craig's job "unusually" easy, as Mother had already made her resume and budget. *Id*. at 100. Craig testified that she was "there to support" Mother. *Id*.

[12] Following the fact-finding hearing, the trial court adjudicated the Children to be CHINS. The trial court then held a dispositional hearing in which it ordered Mother to participate in services. This appeal ensued.

---

[3] DCS did not authorize a substance abuse assessment for Mother as of the date of the fact-finding hearing. Elkins testified that DCS had "overlooked" making a referral for that assessment. *Id*. at 97.

# Discussion and Decision

[13] Mother contends that DCS failed to present sufficient evidence to demonstrate that the Children are CHINS. Our Supreme Court has set out our standard of review.

> When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). "Instead, we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom." *Id.* at 1287 (citation, brackets, and internal quotation marks omitted). When a trial court supplements a CHINS judgment with findings of fact and conclusions of law, we apply a two-tiered standard of review. We consider, first, "whether the evidence supports the findings" and, second, "whether the findings support the judgment." *Id.* (citation omitted). We will reverse a CHINS determination only if it was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). A decision is clearly erroneous if the record facts do not support the findings or "if it applies the wrong legal standard to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (citation omitted).

*Gr. J. v. Ind. Dep't of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 577-78 (Ind. 2017) (alteration in original).

[14] DCS alleged that the Children were CHINS pursuant to Indiana Code Section 31-34-1-1, which provides that a child is a child in need of services if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to

supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[15] Our Supreme Court has interpreted that statute to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287. "A CHINS adjudication focuses on the condition of the child." *N.L. v. Ind. Dep't of Child Servs. (In re N.E.)*, 919 N.E.2d 102, 105 (Ind. 2010).

[16] DCS additionally alleged that J.O. was a CHINS pursuant to Indiana Code Section 31-34-1-10, which provides that a child is a child in need of services if the child is born with "any amount, including a trace amount, of a controlled substance . . . in the child's body, including the child's blood, urine, umbilical cord tissue, or meconium" and the child needs care, treatment, or rehabilitation that the child is not receiving or is unlikely to be provided or accepted without the coercive intervention of the court.

[17] On appeal, Mother does not dispute that she had recently been homeless, that she had previously been convicted of a drug-related felony, that she had used methamphetamine while she was pregnant with J.O., or that J.O.'s cord blood tested positive for methamphetamine. Rather, Mother contends that the trial court erred when it adjudicated the Children to be CHINS because there is

insufficient evidence to demonstrate that the Children need care that they are not receiving or that they are unlikely to receive without the coercive intervention of the court. We must agree.

[18] DCS first asserted that the trial court's coercive intervention is necessary because Mother has a long history of drug use and because Mother had initially lied to DCS about her drug use. To support that contention, DCS presented evidence that Mother was convicted of a felony in 2009 after she had stolen prescription pain pills from patients, that Mother admitted to using methamphetamine in August 2017, and that Mother initially lied to DCS when she told DCS that J.O. had been exposed to methamphetamine while Mother was at a friend's house.

[19] However, when determining whether a Child is a CHINS, courts "'should consider the family's condition not just when the case was filed, but also when it is heard.'" *In re D.J.*, 68 N.E.3d at 580 (quoting *In re S.D.* at 1290) (citation omitted)). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581. Thus, in a CHINS case, we give special consideration to a family's current conditions.

[20] Here, while the facts indicate that Mother has a history of drug use, that Mother had used methamphetamine during her pregnancy, and that Mother had previously been convicted of a drug-related crime, the facts also demonstrate that Mother has received help for her drug problem. Mother testified that she had obtained counseling to help with her "methamphetamine use in remission"

without any assistance or direction from DCS. Tr. Vol. II at 62. Indeed, at the fact-finding hearing, Elkins testified that DCS had "overlooked" offering Mother any substance abuse assessment.[4] *Id*. at 97. But, notwithstanding DCS's oversight, Mother began counseling on her own and had been seeing her counselor once a week for four weeks. And DCS acknowledged that "Mother sought counseling on her own[.]" Appellee's Br. at 9.

[21] Further, DCS did not present any evidence that Mother had tested positive for methamphetamine or any other controlled substances since DCS filed the CHINS petitions. Rather, at the dispositional hearing, Elkins testified that Mother was "testing negative for everything" but her prescription medication and that she had not tested positive for methamphetamine "since the start of the case." *Id*. at 127. Accordingly, the evidence demonstrates that, at the time of the fact-finding hearing, Mother had both received help for her drug problem and responded positively to that help, which included Mother having not failed a single drug test following DCS's removal of the Children.

[22] Still, DCS also alleged that the Children needed care that they were unlikely to receive without the coercive intervention of the court because "Mother's job offer was contingent on her passing a drug screen and background check" and "[a]bsent the income from this job, Mother would not be able to afford the

---

[4] DCS apparently authorized a substance abuse assessment for Mother after the fact-finding hearing. As of the date of the dispositional hearing, Mother had completed that assessment, but DCS had not yet received the results.

apartment she had located." Appellee's Br. at 17-18. In essence, DCS contends that "court intervention was necessary to ensure Mother maintained sobriety and passed the drug screen needed to officially obtain her nursing position." *Id.* at 18.

[23] However, any concern that DCS may have that Mother "would likely not be able to afford her new apartment" or might relapse is merely speculation about a potential future problem. Appellee's Br. at 18. We understand that DCS may be concerned about Mother failing the drug test or the background check, which could cause her to lose her job. But a mere cause for concern "is not the touchstone of a CHINS determination, and an unspecified concern about what might happen in the future is insufficient in itself to carry the State's burden of proof." *L.N. v. Ind. Dep't of Child Servs. (In re L.N.)*, 118 N.E.3d 43, No. 18A-JC-1666, 2019 WL 273110, at *4 (Ind. Ct. App. Jan. 22, 2019).

[24] We conclude that DCS did not present sufficient evidence that Mother needed the coercive intervention of the court in order to protect the Children from homelessness that may occur if Mother were to fail the background check and lose her new job. Rather, Mother testified that her new employer was aware of her criminal history and that she was set to begin her new job less than one month after the fact-finding hearing. In any event, even if Mother were to lose her new job, "the mere fact of an unemployed parent does not make a CHINS." *A.M. v. Ind. Dep't of Child Servs. (In re S.M.)*, 45 N.E.3d 1252, 1256 (Ind. Ct. App. 2015). And even if Mother were to lose her condo, "the mere fact of a family living in a shelter while seeking stable housing does not make a CHINS." *Id.*

There is no dispute that, at the time DCS filed the CHINS petition, Mother was homeless, had recently used methamphetamine, and had recently given birth to a child who tested positive for methamphetamine. But, again, it is well settled that, when determining whether a child is a CHINS, the juvenile court "should consider the family's condition not just when the case was filed, but also when it is heard." *In re S.D.*, 2 N.E.3d at 1290. Here, the evidence demonstrates that, by the time of the fact-finding hearing, Mother had secured employment, created a budget, rented a new condo that was appropriate for the Children, actively and successfully participated in the services DCS had authorized, and sought out, again, with success, counseling on her own in order to stay sober. And Mother had not tested positive for controlled substances since the start of the case. Further, Mother was doing "really, really great" with visits, and she was "parenting and providing everything [the Children] need[.]" Tr. Vol. II at 105.

We acknowledge that the CHINS statutes do not require the juvenile court and DCS to wait until a child is physically or emotionally harmed to intervene. But the CHINS findings must be based on facts and reasonable inferences from the facts, not on speculative future concerns that may or may not ever happen. And it was DCS's burden to prove that the Children needed care that they were unlikely to receive without the coercive intervention of the court. *See In re S.D.*, 2 N.E.3d at 1287. In this case, DCS failed to present any evidence that the Children needed care that Mother was unlikely to provide without the coercive intervention of the court.

In sum, DCS did not meet its burden to demonstrate that the Children have needs that they were unlikely to receive without the coercive intervention of the court. We therefore hold that the trial court erred when it found the Children to be CHINS, and we reverse the trial court's judgment.

Reversed.

Pyle, J., and Altice, J., concur.