## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 23 2020, 8:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

S. Rod Acchiardo
Tell City, Indiana

ATTORNEYS FOR APPELLEE:

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of K.S., Jr., and G.V., (Minor Children), Children in Need of Services,

and

T.S. (Mother),
*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 23, 2020

Court of Appeals Case No. 20A-JC-159

Appeal from the Spencer Circuit Court

The Honorable Karen Werner, Temporary Judge

Trial Court Cause No. 74C01-1910-JC-279 74C01-1910-JC-280

**Tavitas, Judge.**

## Case Summary

T.S. ("Mother") appeals the trial court's order adjudicating Mother's minor children, K.S., Jr., ("K.S.J.") and G.V., (collectively, the "Children"), as children in need of services ("CHINS"). We reverse.

## Issue

Mother raises two issues, which we consolidate and restate as whether sufficient evidence supports the adjudication of the Children as CHINS.

## Facts

Mother is the biological mother of the Children. At the outset of this matter, Mother maintained physical custody of K.S.J., who was born in August 2014, and G.V., who was born in October 2018. K.S., Sr., ("K.S.S.") is the father of K.S.J.; and H.V. is the father of G.V.[1]

On August 26, 2019, the Spencer County Office of the Department of Child Services ("DCS") received allegations of child neglect regarding Mother and Mother's boyfriend, D.D. The source alleged "unsafe conditions in the home, inadequate clothing or hygiene, lack of supervision, exposure to domestic violence, exposure to [ ] illegal activity, and concerns that the [C]hildren's basic

---

[1] Neither father is a party to this appeal.

needs [we]re likely to be unmet due to caregiver impairment." DCS's App. Vol. II p. 8.

[5] That same day, DCS inspected Mother's home, which was clean, had working utilities, and was adequately stocked with food. During the home inspection, family case manager ("FCM") Amy Jarboe asked Mother to submit to a drug screen. Mother refused to comply unless K.S.S. also submitted a drug sample. FCM Jarboe subsequently administered drug screens to K.S.S. and Mother. K.S.S.'s drug screen was negative; however, Mother's drug screen was positive for methamphetamine and amphetamine. DCS, thus, substantiated the tipster's allegations of Mother's drug use. DCS also administered a drug screen to H.V., whose test was negative.[2]

[6] D.D. was present during DCS's inspection of Mother's home. D.D. reportedly did not reside with Mother and the Children; however, FCM Jarboe asked D.D. to submit a drug sample. When D.D. eventually complied, D.D.'s drug test was negative for illegal substances.

[7] On September 5, 2019, FCM Jarboe met with Mother, discussed a safety plan, and informed Mother that she had tested positive for controlled substances. Mother submitted a negative drug screen sample that day and maintained that she had not abused drugs since the usage that prompted the positive drug

---

[2] During the pendency of this action, H.V. also took a hair follicle drug test that was negative for illegal substances.

screen. Mother, however, refused DCS's efforts to administer drug screens on September 12, 2019, and September 13, 2019. On September 23, 2019, the trial court entered an order compelling Mother "to submit to an instant drug screen, [a] hair follicle [drug screen], [to] sign requested releases of information, and [to] allow DCS to conduct a home visit with the children present." *Id.* Mother's instant drug screen that day was positive for THC; however, Mother's drug screen the following day was negative for illegal substances.

[8] DCS initiated an informal adjustment, wherein Mother was required to submit to biweekly drug screens. On September 30, 2019, Mother refused to submit to a drug screen and admitted that she had used marijuana days prior. Mother also failed to respond to DCS's efforts to administer a drug screen on October 1, 2019. Later that day, DCS received the results of Mother's previous hair follicle drug screen, which was positive for methamphetamine and amphetamine.

[9] On October 8, 2019, FCM Jarboe went to Mother's home to remove the Children due to Mother's positive drug screens and Mother's refusal to cooperate with random drug testing. At the time, the Children were at the home of their maternal grandparents.[3] DCS allowed K.S.J. to remain with his maternal grandparents and placed G.V. with his father, H.V. The Children have remained in these placements since they were removed from Mother's

---

[3] It appears, but is somewhat unclear from the record, that Mother had already voluntarily placed the Children in the full-time custody of maternal grandparents when DCS initiated removal procedures.

care. On October 10, 2019, DCS filed a petition alleging the Children were CHINS pursuant to Indiana Code Section 31-34-1-1.

[10] After DCS removed the Children, Mother enrolled in the Boyett Treatment Center in Evansville, Indiana; undertook individual and group therapy; submitted to weekly drug tests; and submitted negative weekly drug test samples for illegal substances over the nearly two-month period before the slated CHINS fact-finding hearing. Mother's drug tests were only positive for her prescribed medication for amphetamine salts. Also, Mother and her family paid for her drug abuse evaluation, drug abuse treatment, and counseling "out-of-pocket[,]" and Mother participated in more group therapy sessions than were required. *Id*. at 104.

[11] The trial court conducted a fact-finding hearing on December 2, 2019. Mother and G.V. appeared and testified at the fact-finding hearing; K.S.S. appeared but did not testify. At the close of the hearing, DCS requested that the trial court order K.S.S. to comply with the trial court's pending order to submit to a hair follicle test. Counsel for K.S.S. advised the trial court that K.S.S. did not intend to comply, and the trial court ordered K.S.S. to comply or risk a potential contempt finding.

[12] Maternal grandparents and Mother's sister, S.N., testified at-length regarding their commitment to the Children and to Mother's sobriety. S.N. testified that she was the only family member who had suspected that Mother had a drug problem and that S.N. regretted allowing Mother's denials to persuade her that

Mother was drug-free. Maternal grandparents and S.N. testified that they had acquired drug testing kits and would not hesitate to test Mother for drug usage, assume custody of the Children, and enroll Mother in an inpatient drug rehabilitation facility if Mother relapsed. *See* Tr. Vol. I p. 63.

[13] Most relevantly, FCM Jarboe testified regarding Mother's demonstrated progress since the Children were removed from Mother's care and FCM Jarboe's belief that the Children's needs were being met both before DCS removed the Children and in maternal grandparents' care. FCM Jarboe maintained that the coercive intervention of the court was only necessary to ensure Mother's continued sobriety. Also, court-appointed special advocate Sandra Bostwick testified: "I think the best place for the boys to be would be with [M]other"; and "as long as [Mother] stays with her therapy[ ], I don't think she really probably needs [services] . . . ." *Id.* at 33. When CASA Bostwick was asked if the Children required any services, she replied, "No." *Id.*

[14] On December 6, 2019, the trial court entered an order, including findings of fact and conclusions thereon, and adjudicated the Children as CHINS as follows:

> 1) That [DCS] has met its burden of proof.
> 2) That the Coercive Intervention of the Court is necessary.
> 3) That the Mother admitted she is an addict.
> 4) That the parents were offered an informal adjustment and did not cooperate.

Mother's App. Vol. II p. 33. After a hearing, the trial court entered its dispositional order, wherein the court ordered Mother to participate in services. Mother now appeals from the CHINS adjudications.

## Analysis

[15] Mother challenges the sufficiency of the evidence to support the CHINS adjudications. CHINS proceedings are civil actions; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010).

> When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. "Instead, we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom." When a trial court supplements a CHINS judgment with findings of fact and conclusions of law, we apply a two-tiered standard of review. We consider, first, whether the evidence supports the findings and, second, whether the findings support the judgment. We will reverse a CHINS determination only if it was clearly erroneous. A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts.

*Gr. J. v. Ind. Dep't of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 577-78 (Ind. 2017) (citations, quotations, and punctuation omitted).

[16] Indiana Code Section 31-34-1-1 provides that a child is a CHINS if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with

necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court. *See In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014) ("Our Supreme Court has interpreted Indiana Code Section 31-34-1-1 to require 'that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion.'").

## I.     *Endangerment*

[17]     Mother first argues that DCS failed to prove that the physical or mental condition of the Children was seriously impaired or seriously endangered. Mother's Br. p. 7. We agree. The purpose of a CHINS adjudication is to protect children, not to punish parents. *N.E.,* 919 N.E.2d at 106. A CHINS adjudication is not a determination of parental fault but, rather, is a determination that a child is in need of services and is unlikely to receive those services without intervention of the court. *Id*. at 105. "A CHINS adjudication focuses on the condition of the child." *Id.* A juvenile court need not wait until a tragedy occurs before adjudicating a Child a CHINS. *In re R.S.*, 987 N.E.2d 155, 158 (Ind. Ct. App. 2013). A child is a CHINS when he or she is endangered by parental action or inaction. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009).

[18]     We initially note that, although the allegations that prompted the CHINS action detailed "unsafe conditions in the home, inadequate clothing or hygiene,

lack of supervision, exposure to domestic violence, exposure to [ ] illegal activity, and concerns that the [C]hildren's basic needs [we]re likely to be unmet due to caregiver impairment," the record on appeal substantiates only the allegation of Mother's drug abuse. *See* DCS's App. Vol. II p. 8. We can only assume from the silent record on appeal that DCS deemed the tipster's allegations of unsanitary household conditions, inadequate food and clothing, other illegal activity, and domestic violence to be unsubstantiated.

[19] DCS argues that the instant case is comparable to *In re J.L.*, 919 N.E.2d 561 (Ind. Ct. App. 2009), and *In Re Des.B.*, 2 N.E.3d 828 (Ind. Ct. App. 2014), in which this Court upheld the trial courts' CHINS adjudications. We cannot agree and find these cases distinguishable. In *J.L.*, DCS presented "clear evidence that [the child] was in the residence while [m]other and [grandmother] were using illegal substances in the bathroom[.]" *See J.L.*, 919 N.E.2d at 564. In *Des.B.*, 2 N.E.3d at 832, DCS presented evidence that the mother relied on controlled substances to function and engaged in pervasive, "pathological" drug use at home, at work, and socially; thus, the record supported the very reasonable inference that the mother parented the children under the influence of controlled substances.

[20] Here, although the trial court found that DCS met its burden of proof to establish that the Children were CHINS, we simply cannot overcome the dearth of evidence of serious endangerment as to Mother. To the contrary, DCS's case-in-chief largely underscored Mother's progress after the Children's removal and the fact that the Children's basic needs were being amply met while in

Mother's care and in maternal grandparents' care. Notably, the following exchange ensued on cross-examination of FCM Jarboe:

Q: Prior to removal, was there any indication that the [C]hildren's physical condition was seriously impaired or endangered?

A: Not to my knowledge.

Q: Was there any indication that the children's mental condition was seriously impaired or endangered?

A: No.

Tr. Vol. I p. 22. FCM Jarboe also testified that, at the time of the Children's removal, DCS had deemed the home of the maternal grandparents to be a suitable placement for the Children. FCM Jarboe testified further, at the time of the fact-finding hearing, that: (1) she had no concerns for the Children's safety; (2) the Children were safe in Mother's care, even without supervision; (3) Mother could meet the Children's needs; and (4) FCM Jarboe had no evidence that Mother parented under the influence of drugs. We cannot say that the record supports the trial court's finding that Mother's actions or inaction seriously endangered the Children.

[21] Our query does not end, however, with our determination that DCS presented insufficient evidence of serious endangerment regarding Mother's parenting. For a child to be a CHINS, DCS must prove, inter alia, that *one or the other of the parents* suffers from shortcomings . . . ." *Matter of E.K.*, 83 N.E.3d 1256, 1260

(Ind. Ct. App. 2017). Thus, we must also consider whether DCS presented sufficient evidence to prove serious endangerment regarding K.S.S.

[22] Although K.S.S. does not appeal the trial court's adjudication of K.S.J. as a CHINS, we consider the evidence contained within the record regarding K.S.S.'s parenting. FCM Jarboe testified that K.S.S. was uncooperative and hostile from the outset of DCS's involvement and refused to submit to court-ordered drug testing. In the following exchange, however, FCM Jarboe also testified that K.S.S. neither possessed nor desired legal custody of K.S.J. and, therefore, did not require DCS-referred services:

> Q: So, [K.S.S.] doesn't need services, does he?
>
> A: During the case, we always offer both parents or all parents services. So, if custody was something [K.S.S.] wanted to pursue, we would recommend services for him.
>
> Q: But if he doesn't want custody and he wants to let his child be with the child's mother, who has custody then he doesn't been [sic] services does he?[4]
>
> A: No.

Tr. Vol. I. p. 11.

---

[4] K.S.S. was present and represented by counsel at the fact-finding hearing and did not object to this line of questioning.

[23] As was the case with Mother, we find the evidence is lacking as to K.S.S. as well. DCS presented no evidence to indicate that K.S.S. used drugs or was impaired by drugs while K.S.J. was present. The record actually makes no mention of the extent to which K.S.S. interacted with or supervised K.S.J. K.S.S.'s failure to cooperate, without more, does not prove, by a preponderance of the evidence, that his actions or inaction seriously endangered K.S.J.

[24] Based on the foregoing, we conclude that DCS did not meet its burden to prove, by a preponderance of the evidence, that the physical or mental condition of the Children was seriously endangered by the actions or inaction of Mother or K.S.S.[5] The trial court's finding that the physical or mental conditions of the Children were seriously endangered is clearly erroneous. We must, therefore, reverse the trial court's adjudication of the Children as CHINS. *See Ad.M v. Indiana Department of Child Services*, 103 N.E.3d 709, 713-14 (Ind. Ct. App. 2018) (reversing the CHINS adjudication for lack of evidence of serious endangerment where, despite presence of marijuana in the parent's home, DCS presented no evidence that the parent was impaired while caring for the children, abused drugs in the presence of the children, or abused drugs while the children were in the home).

---

[5] We do not include H.V. in our analysis, as the record reveals that: (1) he fully cooperated with DCS; (2) DCS placed G.V. in H.V.'s care from the time of removal through the fact-finding hearing; and (3) FCM Jarboe admitted that DCS had "no issues" regarding H.V. Tr. Vol. I. p. 10.

## II. Coercive Intervention

Even if DCS proved that the Children's physical or mental conditions were seriously impaired or seriously endangered, we conclude that DCS also failed to prove that the court's coercive intervention was necessary. Mother argues that, in finding that the Children's needs would not be met without the coercive intervention of the court, "the trial court weighed [her] former sporadic drug use more heavily than [her] present situation of sobriety and commitment to recovery. . . ." Mother's Br. p. 7. We agree and initially note that FCM Jarboe and CASA Bostwick testified that, at both the time of removal and the fact-finding hearing, Mother possessed the ability to meet the Children's basic needs and the Children's basic needs were being met.

The "coercive intervention" element of Indiana Code Section 31-34-1-1 "guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter difficulty in meeting a child's needs.'" *J.B. v. Ind. Dep't of Child Servs.*, 2 N.E.3d 1283, 1287 (Ind. 2014) (citation omitted). When considering the coercive intervention requirement, courts should consider the family's condition not just when the case was filed, but also when it is heard. *Gr. J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 580 (Ind. 2017) (quotations omitted). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581. "Thus, in a CHINS case, we give special consideration to a family's current conditions." *Matter of A.R. v. Ind. Dep't of Child Servs.*, 121 N.E.3d 598, 603 (Ind. Ct. App. 2019).

[27] In *Matter of A.R.*, DCS removed the mother's children and filed a CHINS petition because the mother was homeless, continued to test positive for methamphetamine, and gave birth to a child with methamphetamine in its system. By the time of the fact-finding hearing, however, the mother had undergone drug treatment and counseling on her own initiative; had a pending job offer that would enable her to secure housing; successfully completed services; consistently tested negative for illegal substances; and met the children's needs. Yet, DCS argued that the children's needs were unlikely to be met without the court's coercive intervention because the mother could relapse. The trial court adjudicated the Children as CHINS.

[28] On appeal, this Court reversed and found:

> . . . The evidence demonstrates that, at the time of the fact-finding hearing, Mother had both received help for her drug problem and responded positively to that help, which included Mother having not failed a single drug test following DCS's removal of the Children.

> Still, DCS also alleged that the Children needed care that they were unlikely to receive without the coercive intervention of the court because "Mother's job offer was contingent on her passing a drug screen and background check" and "[a]bsent the income from this job, Mother would not be able to afford the apartment she had located." In essence, DCS contends that "court intervention was necessary to ensure Mother maintained sobriety and passed the drug screen needed to officially obtain [the job]."

> However, any concern that DCS may have that Mother "would likely not be able to afford her new apartment" or might relapse

is merely speculation about a potential future problem. . . . [A] *mere cause for concern "is not the touchstone of a CHINS determination, and an unspecified concern about what might happen in the future is insufficient in itself to carry the State's burden of proof."*

. . . DCS did not present sufficient evidence that Mother needed the coercive intervention of the court . . . .

*Id.* at 604-05 (citations omitted) (emphasis added). The panel emphasized the importance of considering "the family's condition not just when the case was filed, but also when it is heard"; and added that "CHINS findings must be based on facts and reasonable inferences from the facts, not on speculative future concerns that [ ] may not ever happen." *Id.*

[29] Here, as in *Matter of A.R.*, Mother's refusal to submit to random drug screens[6] and failure to cooperate with DCS's informal adjustment properly resulted in the removal of the Children; however, by the time of the fact-finding hearing two months after the removal of the Children, Mother had demonstrated considerable progress. Mother sought out and paid for drug treatment and therapy; and Mother was thriving in treatment, attending individual and group therapy, submitting consistently negative weekly drug samples, and willingly taking a prescription medication that inhibited her desire to use

---

[6] We regard Mother's refused drug tests as presumptively positive. *See E.W. v. J.W.*, 20 N.E.3d 889, 892 (Ind. Ct. App. 2014) ("Mother did not appear for the drug test, and the trial court presumed Mother's nonattendance meant that she would have tested positive.").

methamphetamine. Mother was also employed and had extensive and vigilant family support.

[30] Additionally, FCM Jarboe conceded, in the following exchange, that she had no concerns about Mother's parenting, the Children's needs, or the Children's safety and that her only concern was Mother's ability to maintain sobriety:

> A: At this point, I think we would need to see that [Mother] can continue to maintain her sobriety. When individuals struggle with meth[amphetamine] use, it's not uncommon to see a relapse at some point. Not saying that she would but that's always a concern.
>
> Q: And do you feel like that it's necessary for the Court to intervene to make sure that the services are provided?
>
> A: Yes.

Tr. Vol. I. p. 9.

[31] Our review of the evidence reveals that DCS simply did not carry its burden to establish, by a preponderance of the evidence, that the Children needed care, treatment, or rehabilitation that they were not receiving; and that was unlikely to be provided or accepted without the coercive intervention of the court. Moreover, as in *A.R.*, DCS's stated basis regarding the need for coercive State intervention was the possibility that Mother could relapse. This is insufficient evidence to support a CHINS finding. *See A.R.*, 121 N.E.3d at 604-05 (". . . an

unspecified concern about what might happen in the future is insufficient in itself to carry the State's burden of proof'" in a CHINS case).

[32] Given Mother's demonstrated progress, extensive family support, and the evidence that the Children's needs were amply met both at removal and at the time of the fact-finding hearing, the trial court's finding regarding the need for coercive State intervention is clearly erroneous.

## Conclusion

[33] The trial court's findings are unsupported by the evidence and, thus, are clearly erroneous; accordingly, we must reverse the trial court's CHINS adjudications. We reverse.

[34] Reversed.

Riley, J., and Mathias, J., concur.