## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 15 2020, 7:44 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Roberta L. Renbarger
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of A.L., (Minor Child), Child in Need of Services, | September 15, 2020 |
| and | Court of Appeals Case No. 20A-JC-650 |
| J.H. (Mother), *Appellant-Respondent,* | Appeal from the Allen Superior Court |
| v. | The Honorable Lori K. Morgan, Magistrate |
| | The Honorable Charles F. Pratt, Judge |
| The Indiana Department of Child Services, *Appellee-Petitioner.* | Trial Court Cause No. 02D08-1906-JC-344 |

**Tavitas, Judge.**

# Case Summary

[1] J.H. ("Mother") appeals the trial court's order adjudicating Mother's minor child, A.L., (the "Child"), as a child in need of services ("CHINS"). We affirm.

# Issue

[2] The sole issue on appeal is whether sufficient evidence supports the trial court's CHINS adjudication.

# Facts

[3] Mother and R.L. ("Father")[1] are the biological parents of the Child, who was born on June 26, 2015. On November 23, 2018, Mother shoplifted from the Glenbrook Mall in Allen County when the Child was present. When responding law enforcement officers arrested[2] Mother for conversion and resisting law enforcement, they found open alcohol containers in Mother's possession. The officers notified the Allen County Office of the Department of Child Services ("DCS"),[3] which investigated and substantiated an allegation of neglect, due to Mother's commission of a crime and arrest in the Child's presence. DCS placed the Child into foster care.

---

[1] Father, who was incarcerated during much of the pendency of this matter, is not a party to this appeal.

[2] Mother was released on bond that same day.

[3] Father was incarcerated at the time of Mother's arrest, and Mother was the sole caregiver to the Child.

[4] On November 26, 2018, DCS filed a petition alleging that the Child was a CHINS. After Mother expressed her willingness to participate in services and DCS found inadequate grounds to support a formal CHINS petition, Mother and DCS entered an informal adjustment on February 4, 2019. Pursuant to the informal adjustment, Mother agreed to undergo psychotherapy and psychological testing; participate in home-based case management; and undertake parenting education. Mother also agreed to comply with "all legal consequences" stemming from her guilty plea and conviction. Tr. Vol. II pp. 72-73. The Child was returned to Mother's care.

[5] On February 21, 2019, Mother pleaded guilty in the criminal court to resisting law enforcement and was sentenced to twenty-five community service hours through Allen County Community Corrections ("ACCC"). On March 26, 2019, ACCC discharged Mother for failing to attend and complete a mandatory orientation. The criminal court issued an arrest warrant for Mother's noncompliance, and Mother was arrested on June 4, 2019. Mother arranged for her paternal grandmother to take custody of the Child from a daycare facility; however, Mother did not provide the paternal grandmother's address to DCS upon request.

[6] On June 17, 2019, DCS filed another petition alleging that the Child was a CHINS. DCS cited Mother's incarceration and resulting inability to supervise the Child in support of its petition, which provided: "Mom is not complying with the [informal adjustment] agreement. Mom is currently incarcerated and [the C]hild's whereabouts are unknown. Mom is refusing to give [DCS]

information as to where the [C]hild currently is." DCS's App. Vol. II p. 3. On June 25, 2019, Mother admitted that she violated the terms of her community corrections placement. The criminal court amended Mother's sentence; gave Mother credit for time served; and released Mother. On June 28, 2019, the trial court terminated the informal adjustment as unsuccessful.

[7] In July 2019, the Child was placed with Mother's grandmother, M.L.[4] On August 17, 2019, Mother was arrested for public intoxication and disorderly conduct as Class B misdemeanors. Mother subsequently pleaded guilty pursuant to a plea agreement that contemplated a six-month suspended sentence.

[8] The trial court conducted a CHINS fact-finding hearing on September 27, 2019. Mother testified that she has met the Child's basic needs;[5] properly supervised the Child; and arranged for family supervision of the Child when Mother was incarcerated. When Mother was asked if she needs "further psychological testing and treatment[,]" she said, "No thank you no." Tr. Vol. II p. 47.

[9] On October 2, 2019, the trial court entered an order removing the Child from M.L.'s care and placing the Child in foster care.[6] On December 26, 2019, the

---

[4] The record is unclear as to how this change in the Child's foster placement transpired.

[5] Mother receives Supplemental Nutrition Assistance Program (SNAP) and Medicaid assistance.

[6] The order provided in part as follows: (1) the Child was in placement with M.L.; (2) "[t]he [C]hild is not progressing well in said placement[,]"; (3) "[t]he present placement is inappropriate"; (4) "[n]o suitable and willing relative caretakers are available for the [C]hild's placement"; and (5) "[t]he Court now orders the [C]hild placed in licensed foster care." DCS's App. Vol. II p. 22.

trial court adjudicated the Child as a CHINS and found: "the [C]hild is A Child in Need of Services as defined by I.C. 31-34-1-1" and "needs care, treatment or rehabilitation that the [C]hild is not receiving and that is unlikely to be provided or accepted without the coercive intervention of the court." Mother's App. Vol. II p. 19. The trial court entered its dispositional order on February 20, 2020.[7] Mother now appeals the CHINS adjudication.

# Analysis

## I. Sufficiency of the Evidence

Mother challenges the sufficiency of the evidence to support the CHINS adjudication. CHINS proceedings are civil actions; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010).

> When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. "Instead, we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom." When a trial court supplements a CHINS judgment with findings of fact and conclusions of law, we apply a two-tiered standard of review. We consider, first, whether the evidence supports the findings and, second, whether the findings support the judgment. We will reverse a CHINS determination only if it was clearly erroneous. A decision is clearly erroneous if the record facts do not support

---

[7] The disposition order required Mother to: (1) participate in parenting education and supervised visitation; (2) undergo individual therapy; (3) submit to random drug testing; (4) complete a substance abuse assessment; (5) participate in supervised visitation; (6) maintain appropriate housing; (7) refrain from criminal activity; (8) cooperate with DCS and service providers; and (9) keep DCS apprised of changes in Mother's address, employment, and within Mother's household.

the findings or if it applies the wrong legal standard to properly found facts.

*Gr. J. v. Ind. Dep't of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 577-78 (Ind. 2017) (citations, quotations, and punctuation omitted).

[2] Indiana Code Section 31-34-1-1 provides that a child is a CHINS if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court. *See In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). "Our Supreme Court has interpreted Indiana Code Section 31-34-1-1 to require 'that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion.'". *Id.*

[3] The purpose of a CHINS adjudication is to protect children, not to punish parents. *N.E.,* 919 N.E.2d at 106. A CHINS adjudication is not a determination of parental fault but, rather, is a determination that a child is in need of services and is unlikely to receive those services without intervention of the court. *Id*. at 105. "A CHINS adjudication focuses on the condition of the child." *Id*. A juvenile court need not wait until a tragedy occurs before adjudicating a child a CHINS. *In re R.S.*, 987 N.E.2d 155, 158 (Ind. Ct. App.

2013). A child is a CHINS when he or she is endangered by parental action or inaction. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009).

### *I. Serious Impairment or Endangerment*

[4] Mother argues that DCS presented "no evidence" that: (1) the Child was "neglected, abused or abandoned"; (2) Mother "failed to provide the [C]hild with the necessary food, clothing, shelter or medical care, education or supervision"; or (3) Mother lacked "family support to provide supervision for the [C]hild [when] Mother was not personally able to provide the required supervision . . . ." Mother's Br. pp. 11, 12, 14.

[5] The trial court's pertinent findings of fact are as follows:

> J. There are significant concerns about the mental stability of [Mother] and her ability to parent the [C]hild and to provide her with a safe, stable home environment. The DCS has concerns that the [C]hild's mental and physical health is endangered due to [M]other's failure to participate in and benefit from the services that have been identified by the mental health professionals as essential services for [M]other given her mental health diagnoses.
>
> * * * * *
>
> L. The Court finds [M]other continues to commit significant thinking errors that interfere with her ability to supply the [C]hild with necessary food, clothing, shelter, medical care, education, or supervision. She has engaged in criminogenic activity that led to her incarceration thus separating herself from her young child and the mother's arrest in the [C]hild's presence endangered the [C]hild's

psychological well-being. . . . .The [C]hild was in [Mother's] care at the time of her arrest on the outstanding warrant and she placed the [C]hild with a relative during her incarceration, yet refused to provide the DCS with the address where the [C]hild was residing. The diagnostic assessment and psychological evaluation that the mother completed noted concerns with her expectations of the [C]hild's skills and abilities. Psychotherapy was recommended to address coping skills and to help with impulse control and emotional regulation and to provide support in parenting. Parenting classes and home based services were also recommended to assist [M]other with the care of the [C]hild and the provision of the [C]hild's needs. . . . . [Mother]'s poor decisionmaking, frequent incarcerations, and poor parenting interferes with her ability to provide the [C]hild with a safe, stable and appropriate home and has impacted the [C]hild psychologically. Accordingly, the Court finds that the [C]hild's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of [Mother] to supply the [C]hild with necessary food, clothing, shelter, medical care, education, or supervision.

The [C]hild is in need of a safe, stable home environment with proper parenting as well as counseling to assist her in dealing with the trauma caused by being present while her mother was arrested . . . . Although [Mother] has a home to reside in with the [C]hild, there are significant concerns about her unaddressed mental health diagnoses and their impact on her parenting of the [C]hild as well as her ability to provide a safe home environment for the [C]hild. In 2019, she submitted to a psychological evaluation at Park Center and was diagnosed with Narcissistic Personality Disorder and with a Parent-Child Relational Problem. In 2018, she submitted to a diagnostic evaluation at Quality

Counseling and was diagnosed with bi-polar disorder with psychotic features and personality disorder—possible schizotypal. Both evaluators noted concerns with [M]other's bizarre thought content and questioned how tied to reality she was. Both recommended parenting education, counseling and home based services to address the family's needs. [Mother] has failed and refused to participate in the services recommended . . . and her mental health needs remain unaddressed. Due to the [M]other's significant mental health pathology, the mental health evaluators have recommended services before reunification of the [C]hild in order to ensure the [C]hild's safety. [M]other has not participated in and/or completed those services.

Mother's App. Vol. II pp. 17, 18.

[6] At the fact-finding hearing, Dr. Jason Cook, a DCS-referred service provider contracted through Quality Counseling & Psychological Services, testified that he "perform[ed] psychological . . . diagnostic assessments and testing" on Mother. Tr. Vol. II p. 27. Dr. Cook testified that, in describing the mall arrest incident, Mother stated that she suspected a mall security officer intended to harm the Child. Dr. Cook testified: "[Mother] presents [ ] as potentially plausible yet [ ] had a [ ] feel of possibly [ ] potentially delusional at the same time[.]" *Id.* at 33. Dr. Cook testified further that the diagnostic assessment led him to "speculat[e]" as to whether Mother's symptoms—"bizarre thought processes [ ] and eccentric behavior tied to it"—fit either a bipolar disorder with psychotic features or a possible schizotypal personality disorder[.]" *Id.* at 29.

Dr. Cook testified that he could not determine which diagnosis would best address Mother's symptoms and recommended further testing as follows:

> A: [ ] I believe . . . that we needed to have further psychological testing [that] would of [sic] included [ ] more in depth personality assessment[,] that she probably should be engaged in psychotherapy to [ ] address impulse control and emotional regulation, [that] she should [ ] engage in parenting classes, [ ] and if reunification was [ ] to happen[,] in-home services during the process[,] complete legal consequences [ ] if any remain[,] and that she probably needs a psychiatrist evaluation based on the results of the psychological testing after being completed.
>
> * * * * *
>
> Q: [Why did you recommend] in-home [case management] services if we sought reunification?
>
> A: . . .[B]ecause . . . there's enough [ ] bizarre content or possible bizarre content and it wasn't clear how tied to reality she was and having . . . someone in the home to . . . watch the process and make sure things remain stable and appropriate seems like a good recommendation.
>
> Q: . . .[A]nd would you have any concerns [ ] with [ ] what physical or mental well[-]being of a child in her care as a result of that assessment?
>
> A: . . . I want to make certain what the diagnosis was . . . there are concerns and based on the diagnosis that she should receive appropriate treatment for those diagnoses [ ] before having unsupervised [ ] care of children.

*Id*. at 30-31.

Next, Tabitha Kyburz, DCS Liaison and Team Leader Supervisor of Quality Counseling and Psychological Services, testified that DCS referred Mother for "psych testing[,] diagnostic evaluation[,] supervised visitation[,] casework services[,] parenting education[,] and individual counseling." *Id.* at 37. Kyburz testified that Mother completed the psychological testing and diagnostic evaluation referrals and participated in supervised visitation; however, Mother started but did not complete home-based case management, parenting education, and cleaning and organization of the home.[8] Kyburz noted that Mother routinely started but failed to complete tasks. Also, regarding home-based case management, Kyburz testified that, soon after Kyburz and Mother cleaned and organized the bedrooms in Mother's home, Mother and the Child were sleeping in the living room of the home because the bedrooms "were again disorganized [and] not usable." *Id.* at 40.

Additionally, psychologist Sydney Young ("Psychologist Young") of Park Center testified that DCS referred Mother "for diagnostic clarifications[,] treatment recommendations[,] and [assessment of] parenting abilities." *Id.* at 62. Psychologist Young testified that: "based off the clinical interview and data gathered," Mother "indicated [ ] symptoms associated with narcissistic personality disorder"; and "[Mother's] judgment may impact her ability to

---

[8] In Mother's testimony during the fact-finding hearing, she testified that she completed parenting education through a different service provider and participated in home-based case management "as far as until it was put on hold." Tr. Vol. II p. 43.

parent [ ] due to her expansive thought process and her very lofty goals." *Id*. at 65, 68. Psychologist Young testified further:

> . . . [M]y recommendations were for [Mother] to undergo additional assessment or interviewing for potential [ ] substance use issues . . . because there were prior arrest histories for alcohol and substance use was denied at intake[.] * * * * * I also referred for in-home skills and therapy . . . in addition to parenting classes so [Mother] could better understand her child's developmental stages [and] needs.

*Id*.

[9] Also, DCS family case manager Natasha Jones ("FCM Jones") testified that Mother failed to satisfy the requirements of the informal adjustment. FCM Jones testified that: (1) Mother's arrest for violating the terms of community corrections violated the requirement that Mother should complete all legal consequences related to her criminal conviction; (2) Mother refused to divulge the precise whereabouts of the Child to DCS after Mother's June 2019 arrest; (3) Mother did not comply with the recommendations that stemmed from the diagnostic evaluation—namely, individual counseling and home-based case management with parenting instruction; and (4) Mother's two criminal arrests during the pendency of the CHINS action violated the trial court's order that Mother should refrain from any criminal activity. FCM Jones testified further that DCS's ongoing concerns related to Mother's "mental [ ]instability and her [ ] ability to parent"; and that the Child's mental and physical stability are

endangered by Mother's failure to complete all the recommendations from the diagnostic assessment. *Id*. at 74.

[10] Our assessment of DCS's case-in-chief is as follows. At the outset of DCS's involvement, DCS pursued an informal adjustment with Mother, wherein Mother retained custody of the Child. The informal adjustment was terminated as unsuccessful, however, when Mother was arrested two times during the CHINS pendency and failed to follow mental health service providers' recommendations that were vital to Mother's reunification efforts.[9] The record reveals that Psychologist Young recommended that Mother undergo additional psychological testing. Likewise, Dr. Cook recommended further psychological testing to: (1) determine Mother's precise mental health diagnosis; (2) assess "how tied to reality she [is]"; (3) "make sure things remain stable and appropriate"; and (4) because "there are concerns and based on the diagnosis that she should receive appropriate treatment for those diagnoses [ ] before having unsupervised [ ] care of children." *Id*. at 30-31. As of the time of the fact-finding hearing, Mother had not submitted to the recommended psychological testing. When counsel for DCS asked Mother, "Do you believe you need further psychological testing and treatment[,]" Mother replied, "No thank you no." *Id*. at 47.

---

[9] Mother also failed to complete individual therapy and home-based case management services as ordered.

[11] As noted above, a juvenile court need not wait until a tragedy occurs before adjudicating a Child a CHINS. *R.S.*, 987 N.E.2d at 158. The record documents the extent to which DCS harbored concerns about Mother's uncertain mental health diagnoses and untreated mental health issues. Dr. Cook and Psychologist Young testified regarding the need for additional psychological testing. Dr. Cook, in particular, testified that it is imperative to determine whether Mother's irrational and grandiose thinking interferes with her parenting ability and to identify and treat Mother's mental health conditions before the Child may be restored to Mother's unsupervised care.

[12] Given: (1) DCS's concerns about Mother's mental stability and ability to parent; (2) Mother's failure to follow through with mental health treatment recommendations; and (3) Mother's stated unwillingness to submit to recommended psychological testing, we see no clear error in the trial court's finding that the Child's physical or mental condition is seriously impaired or seriously endangered as a result of Mother's inability, refusal, or neglect to supply the Child with necessary supervision.

## II. *Coercive Intervention*

[13] Mother also challenges the trial court's finding that the Child's needs will not be met without the coercive involvement of the court. The "coercive intervention" element of Indiana Code Section 31-34-1-1 "guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter difficulty in meeting a child's needs.'" *J.B. v. Ind. Dep't of Child Servs.*, 2 N.E.3d

1283, 1287 (Ind. 2014) (citation omitted). When considering the coercive intervention requirement, courts should consider the family's condition not just when the case was filed, but also when it is heard. *Gr. J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 580 (Ind. 2017) (quotations omitted). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581. "Thus, in a CHINS case, we give special consideration to a family's current conditions." *Matter of A.R. v. Ind. Dep't of Child Servs.*, 121 N.E.3d 598, 603 (Ind. Ct. App. 2019).

[14]    The trial court's pertinent findings are as follows:

> [M]other is in need of services to assist her in providing a safe, stable home for herself and her child and to assist her in addressing her untreated mental health conditions. . . . DCS has demonstrated that it is unlikely that the mother will accept or receive necessary services absent the coercive intervention of the Court. [Mother] was given an opportunity to participate in services through an Informal Adjustment . . . . The Informal Adjustment case was closed out unsuccessfully in June of 2019 due to the mother's non-compliance. In the mother's criminal proceeding, she was given an opportunity to participate in community service as part of her sentence for her criminal charges, however, she failed to participate in the orientation for the community service program and a warrant was issued for her arrest. [M]other was ordered to participate in services provisionally in these proceedings, however, when ordered to do so, has failed to participate in services. [M]other has demonstrated a pattern of a refusal to participate in necessary services on a voluntary bases [sic] as well as necessary services when ordered to do so by a Court. Accordingly, the Court finds that it is unlikely that [M]other will accept or receive the necessary services without the coercive intervention of the court.

Mother's App. Vol. II p. 19.

At the fact-finding hearing, Dr. Cook and Psychologist Young testified that Mother needs to undergo additional psychological testing. Dr. Cook testified further that such testing should occur before the Child is returned to Mother's unsupervised care. On the witness stand, however, Mother testified that she does not require additional psychological testing or treatment. Additionally, FCM Jones testified that she recommends home-based case management and individual therapy that Mother has yet to complete. When Counsel for DCS asked FCM Jones, "[D]o you believe that [Mother] will [ ] accept those services without the intervention of the Court," FCM Jones replied, "No." Tr. Vol. II p. 75.

Based on the foregoing, and reasonable inferences from Mother's noncompliance with the terms of the informal adjustment and her ACCC placement, we find no clear error from the trial court's finding that the Child's needs are unlikely to be met without the coercive involvement of the court.

## Conclusion

Sufficient evidence supports the trial court's CHINS adjudication. We affirm.

Affirmed.

Kirsch, J., and Pyle, J., concur.