# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Christopher Sturgeon
Clark County Public Defender Office
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of J.L. and T.L., Children in Need of Services,

M.L., Father,[1]

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

November 25, 2020

Court of Appeals Case No. 20A-JC-281

Appeal from the
Clark Circuit Court

The Honorable
Vicki L. Carmichael, Judge
The Honorable
Joni L. Grayson, Magistrate

---

[1] Mother admitted that J.L. and T.L. were children in need of services and does not participate in this appeal. *Appellant's App. Vol. 2* at 34-36.

**Kirsch, Judge.**

In this consolidated appeal, M.L. ("Father") appeals from the juvenile court's dispositional order following the determination that J.L. and T.L. ("the Children") were children in need of services ("CHINS").[2] He raises the following two issues for our review:

> I. Whether the juvenile court committed clear error when it determined that the Children were CHINS; and

> II. Whether the juvenile court abused its discretion when it ordered Father to meet certain requirements and participate in services under the dispositional order.

We affirm.

---

[2] This court granted Father's motion to consolidate the appeal involving T.L. under 20A-JC-282 with this appeal. *Appellant's App. Vol. 2* at 172.

# Facts and Procedural History

On October 28, 2019, the Clark County Office of the Indiana Department of Child Service ("DCS") filed petitions alleging that J.L., born April 27, 2016, and T.L., born October 14, 2010, were CHINS. *Appellant's App. Vol. 2* at 6, 233. The petitions alleged that the Children were CHINS under Indiana Code section 31-34-1-1 based on allegations of substance abuse in the home, S.L. ("Mother") having tested positive for methamphetamine, and Father's pending charge for domestic battery against Mother. *Id.* at 6-7; 223-24. DCS did not remove the Children from the home at that time. *Id.* At the November 4, 2019 initial hearing, Mother and Father denied the allegations in the petitions, were appointed counsel, and the matter was set for a fact-finding hearing on December 5, 2019. *Id.* at 23-24.

On December 5, 2019, Mother and Father entered a minute sheet admitting that the Children were CHINS. *Id.* at 34. Mother admitted that "she has substance abuse issues that need to be addressed [and] therefore [the Children are] CHINS; They accept intervention of [court] and agree to participate in services." *Id.* Father admitted that the Children are CHINS "based on the [Mother's] admission to drug abuse. [Father] agrees to the psychological assessments, looking for D/M counseling." *Id.* On December 9, 2019, the juvenile court accepted the admissions of Mother and Father that the Children were CHINS. *Id.* at 35-36. On December 12, 2019, Father sought to withdraw his prior admission that the Children were CHINS, and on December 19, 2019, the juvenile court granted Father's request to withdraw his admission that the

Children were CHINS and held a fact-finding hearing. *Appellant's App. Vol. 2* at 163-64.

[5] At the fact-finding hearing, Family Case Manager ("FCM") Raven Roberson ("FCM Roberson") testified that her involvement began when DCS received a report about the family regarding concerns that Mother was abusing substances and an allegation of a domestic violence incident between Mother and Father. *Fact-Finding Hearing Tr. Vol. 2* at 12. FCM Roberson stated she first went to T.L.'s school to speak with him, but T.L. did not tell her anything about drug use in the home; she did not speak with J.L. because he was only three years old at the time. *Id.* at 13. FCM Roberson then went to Mother and Father's residence and knocked on the door for "several minutes with no answer at the door." *Id.* FCM Roberson eventually contacted local law enforcement and with law enforcement's assistance was then able to go into the residence and speak with Mother and Father. *Id.* at 13-14.

[6] FCM Roberson first spoke with Mother, who denied using drugs. *Id.* at 14. FCM Roberson stated that Mother agreed to take a drug screen while Father did not. *Id.* She also confirmed that Mother had filed a report with the Sellersburg Police Department in December 2018 that alleged that Father had been abusing her throughout their ten-year relationship. *Id.* at 14-15. FCM Roberson stated that Father denied that the domestic violence occurred, that Mother denied the domestic violence occurred, and Mother claimed that the report she filed was false. *Id.*

[7] FCM Roberson testified that Mother's drug screen returned positive for amphetamine and methamphetamine. *Id.* at 15. Mother denied using drugs but agreed to take a second drug test, which also returned positive for amphetamine and amphetamine at "higher levels." *Id.* Following Mother's two positive drug screens, FCM Roberson offered Mother and Father a program of informal adjustment. *Id.* at 15-16. FCM Roberson stated that Father had verbally agreed to the informal adjustment and that he had "shown up for meetings when we ask him to but as far as doing screens or anything like that or participating in any services he has not done that." *Id.* at 16. FCM Roberson administered Mother a third drug screen that also tested positive for amphetamine and methamphetamine at "very high levels." *Id.* at 17. In arranging the informal adjustment, FCM Roberson attempted to hold a child and family team meeting, but Mother and Father failed to bring the people who would serve as a support system to help them with the program, so DCS was "never able to go forward" with the informal adjustment *Id.* at 16. FCM Roberson explained that her concerns for the Children were that Mother was home all day with three-year-old J.L. while T.L. was at school, that it was "unknown when she's using if she's impaired while she's taking care of [J.L.] while he's at home" and that Mother had stopped doing drug screens. *Id.* at 17.

[8] On cross-examination, FCM Roberson acknowledged that the domestic violence charges filed against Father were dismissed without prejudice on October 28, 2019. *Id.* at 19-20; *Father's Ex.* 1. FCM Roberson further indicated that, although she had no drug screens from Father, because he had never

provided a drug screen, she had "concerns" that Father was also using drugs but acknowledged that there was no evidence of positive drug screens. *Fact-Finding Tr. Vol. 2* at 20. She also indicated that when she had been inside the residence it appeared clean and orderly and that there was food in the kitchen and pantries. *Id.* at 20-21.

[9] FCM Ben Peterhansen ("FCM Peterhansen"), who had been working on the case for three months after receiving it from FCM Roberson, first attempted to begin services for the family through the informal adjustment. *Id.* at 22-23. FCM Peterhansen testified that Father was seeking substance abuse treatment at "North Clark and that he would like to look at some other options on top of it." *Id.* at 22. FCM Peterhansen testified that he had offered Father services, including a substance abuse assessment but that Father never completed the assessment, even though the assessment had been rescheduled on two occasions. *Id.* at 23. He stated that both Father and Mother had been "minimally compliant" with the home-based case work that had been referred two months earlier, and that neither Father nor Mother had fully started any services. *Id.* FCM Peterhansen had also tried unsuccessfully on four occasions to hold a child and family team meeting, and by the time of the fact-finding they still had not held a child and family team meeting, which prevented him from being able to identify other needs. *Id.* at 23-24. FCM Peterhansen added that Father told him that both he and Mother "have a substance abuse history, are both going to North Clark, are on weekly Suboxone" and that "they would be open to receiving more substance abuse treatment." *Id.* at 24.

[10] FCM Peterhansen was concerned about substance abuse in the home because Father had never taken a drug screen, and FCM Peterhansen could not verify whether Father was using drugs, including Suboxone. *Id.* at 24-25. FCM Peterhansen confirmed that Mother and Father still resided in the same home with the Children and that Father slept during the day and was unable to care for the Children. *Id.* at 26. The juvenile court asked FCM Peterhansen if Mother had been present on his visits to the home, and he responded affirmatively. *Id.* at 29. With respect to whether Father had been present in the home, FCM Peterhansen stated Father had not been present "every time" he had been in the home but that Father had "been there one or two times that I have been there" and that he estimated he had been to the home five times. *Id.* When asked whether, when he had been in the home when Father was not there, if any other caregivers had been in the home, he stated "[n]ot that I've observed." *Id.*

[11] Father testified that he works for an alarm company in Louisville, Kentucky and that Mother is at home while he is at work. *Id.* at 31. Father said that he asked his parents, who live two streets over, to come over more often to his home when the CHINS cases first began. *Id.* at 31-32. Father denied having a drug problem, acknowledged that he saw a doctor for Suboxone treatment, and stated that if he was tested for drugs it would show nothing but Suboxone.[3] *Id.*

---

[3] Father also took Neurontin which he described as a "nerve pill" that was a "non-narcotic" he used to treat a pinched nerve in his neck. *Fact-Finding Hearing Tr. Vol. 2* at 32.

at 32. He responded affirmatively when asked whether Mother "needs some assistance and help" with respect to her substance abuse. *Id.* at 35. Father acknowledged that he needed more help in the home because he was possibly getting another job, which meant less time at home. *Id.* at 35-36; 45-46. He stated that his father comes to the home "a few days" each week. *Id.* at 36. Father testified that it was his belief that the Children were safe, even when he was not home and when the Children were in Mother's care, and that DCS did not need to be involved. *Id.* With respect to Mother's drug use, the following exchange occurred:

Q: Do you know that she uses substances?

A: Do I acknowledge it? Yeah. I mean I know that yes.

Q: You know that she does?

A: Yeah.

Q: Did you know she was using methamphetamine?

A: No.

Q: What substances does she use?

A: I guess methamphetamine obviously.

*Id.* at 43-44. He further acknowledged that there had to be someone to care for the Children if Mother was using methamphetamine. *Id.* at 44.

[12]    At the conclusion of the fact-finding hearing, the juvenile court determined that the Children were CHINS, stating

> I'm going to find that there are obviously times and situations where these Children are left in the care of their mother who has admitted that the children are children in need of services. And the father has not presented the court with a safety plan that insures [sic] that the children will have a sober care giver at all times he's at work. It's disconcerting to the Court that you would think sir, that your wife, who has admitted to having a substance use issue has asked for help and who has tested positive for illicit substances on several occasions that you somehow would come here and say yeah the kids are okay when I'm with her. Or okay if they're not, my parents come by a couple times a week, thinking that that's sufficient. Because it's not.

*Id.* at 48-49. The juvenile court also noted that, while it could not order Father to take a drug screen, it encouraged Father to do so because it "sure would go a long way toward helping me understand what's at the root of all this." *Id.* at 50.

[13]    On January 3, 2020, the juvenile court entered its orders determining that the Children were CHINS and finding as follows:

> 2) Respondent Mother admitted to the children being in need of services due to her issues with substance use.

> 3) Father acknowledges that he is aware of Mother's substance use.

4) The children are left in the care of Respondent Mother who has admitted to the children being CHINS based on her substance use issues.

5) Respondent Father does not have an adequate plan to ensure that the children will have a sober care giver at all times.

*Appellant's App. Vol. 2* at 120-21; *Appellant's App. Vol. 3* at 130-31.

[14] On January 9, 2020, the juvenile court held the dispositional hearing. *Appellant's App. Vol. 2* at 164. The juvenile court admitted the previously-filed predispositional report into evidence, which included a safety plan. *Dispositional Hearing Tr. Vol. 2* at 9; *Appellant's App. Vol. 2* at 111-12; *Appellant's App. Vol. 3* at 121-22. Father, who was represented by counsel, stated to the juvenile court that he did not "agree to any" of the contents of the predispositional report, but his counsel did not make a specific objection. *Id.* at 10. FCM Peterhansen described the substance of the predispositional report's requirements, which included not using illegal drugs, submitting to drug screens, not committing acts of domestic violence, and completing psychological, parenting, and substance abuse assessments and following their recommendations. *Id.* at 10-11. DCS requested the domestic violence assessment because "there were concerns in the report about domestic violence." *Id*. at 12. The juvenile court accepted the recommendations in the predispositional report, incorporated them into the dispositional order's findings and conclusions, and ordered Father to complete a drug screen that

same day. *Id.* at 13, 15. Following the hearing, the juvenile court entered the dispositional order.[4] *Appellant's App. Vol. 2* at 122-26. Father now appeals.

# Discussion and Decision

## I.   CHINS Adjudication

Father challenges the Children's adjudications as CHINS. Where, as here, a juvenile court enters findings of fact and conclusions of law in a CHINS decision, we apply a two-tiered standard of review. *In re Des. B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014). We first consider whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We may not set aside the findings or judgment unless they are clearly erroneous. *Id.* Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* We give due regard to the juvenile court's ability to assess witness credibility and do not reweigh the evidence; we instead consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* We defer substantially to findings of fact, but not to conclusions of law. *Id.*

---

[4] On January 10, 2020, the juvenile court ordered the Children removed from Parents' care because Mother continued to test positive for drugs, Father left the courthouse after the hearing and failed to submit to the drug screen that the juvenile court had previously ordered, and DCS could not ensure that the Children had sober caregivers. *Appellant's App. Vol. 2* at 127-28. The Children were later placed with their paternal grandparents. *Id.* at 145-46.

Unchallenged findings "must be accepted as correct." *Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1991).

[16]    A CHINS proceeding is civil in nature, so DCS must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). The CHINS petition was filed pursuant to Indiana Code section 31-34-1-1, which states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
> (A) when the parent, guardian, or custodian is financially able to do so; or
>
> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[17]    A CHINS adjudication focuses on the needs and condition of the child and not the culpability of the parent. *In re N.E.*, 919 N.E.2d at 105. The purpose of a CHINS adjudication is not to punish the parent but to provide proper services for the benefit of the child. *Id.* at 106. "[T]he acts or omissions of one parent can cause a condition that creates the need for court intervention." *Id.* at 105. "A CHINS adjudication can also come about through no wrongdoing on the part of either parent[.]" *Id.*

> While we acknowledge a certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that - a determination that a child is in need of services. Standing alone, a CHINS adjudication does not establish culpability on the part of a particular parent. Only when the State moves to terminate a particular parent's rights does an allegation of fault attach. We have previously made it clear that CHINS proceedings are "distinct from" involuntary termination proceedings. The termination of the parent-child relationship is not merely a continuing stage of the CHINS proceeding. In fact, a CHINS intervention in no way challenges the general competency of a parent to continue a relationship with the child.

*Id.* (citations omitted).

[18]    Father argues that the evidence was insufficient to prove that the Children were CHINS, and he contends that Findings 2, 4, and 5 do not support the judgment. We note at the outset that while Father challenges how the trial court used those findings to support the CHINS adjudication, he does not specifically challenge them as clearly erroneous or unsupported by the evidence. Thus, we accept the unchallenged findings as correct. *See Madlem*, 592 N.E.2d at 687.

[19]     Father argues that in Findings 2 and 4 the trial court erroneously used Mother's admissions about her substance abuse and that the Children were CHINS against him. He cites *In re K.D.* 962 N.E.2d 1249 (Ind. 2012) and *In re T.N.*, 963 N.E.2d 467 (Ind. 2012) in support of his position. With respect to Father's arguments that the trial court used Mother's admissions against him, we agree with DCS that Father's reliance on *In re K.D. and In re T.N.* is misplaced. In *In re K.D.*, the Indiana Supreme Court held that the stepfather had a due process right to a fact-finding even when the children's mother admitted that the children were CHINS. 962 N.E.2d at 1259. In *In re T.N.*, a companion case issued the same day, the Indiana Supreme Court held that "when one parent wishes to admit and one parent wishes to deny the child is in need of services, due process requires the trial court to conduct a factfinding." 963 N.E.2d at 469. Contrary to Father's assertions, these cases do not stand for the proposition that a trial court cannot consider a parent's admission that her children are CHINS at a subsequent fact-finding; rather, they address the necessity of holding a fact-finding hearing if one parent does not wish to admit a child is CHINS. Here, Father initially admitted that the Children were CHINS, and when he asked to withdraw his admission, the trial court allowed him to do so and held a fact-finding hearing. *Appellant's App. Vol. 2* at 34-36; *Fact-Finding Hearing Tr. Vol. 2* at 9-12. Unlike the respondents in *In re K.D. and In re T.N.*, who received contested dispositional hearings but did not receive fact-finding hearings, Father received a fact-finding hearing when he withdrew his admission and was able to present testimony and evidence. Moreover, Father never challenged Mother's admissions during the fact-finding and,

instead, admitted he knew Mother was using methamphetamine, was taking care of the Children, and needed help. *Id.* at 31-32, 35, 43-44. We cannot say that the juvenile court improperly used Mother's admissions against Father.

[20] With respect to Finding 5, Father argues that the juvenile court erred by shifting the burden of proof to him when it found that "Respondent Father does not have an adequate plan to ensure that the children will have a sober care giver at all times." *Appellant's App. Vol. 2* at 121; *Appellant's App. Vol. 3* at 131. Father also maintains that Indiana Code section 31-34-12-3 places the burden of proof in a CHINS case squarely on DCS, and that the sole circumstances that allow any burden shifting are Indiana Code section 31-34-12-4, which provides for a rebuttable presumption that a child is a CHINS in specified circumstances where a child has been injured, and Indiana Code section 31-34-12-4.5, which provides for a rebuttable presumption that a child is a CHINS in circumstances involving certain offenses.

[21] We agree with Father that DCS bears the burden of proving its case by a preponderance of the evidence. *See* Ind. Code § 31-34-12-3; *In re N.E.*, 919 N.E.2d at 105. We further agree with Father that Indiana Code sections 31-34-12-4 and 4.5 are instances in which the legislature has allowed for burden shifting in certain scenarios. We do not believe, however, that any such burden shifting occurred in this case as DCS maintained the burden of proving that the

Children were CHINS throughout the proceedings.[5] Here, Father testified at the fact-finding hearing after DCS had concluded its case-in-chief that he did not believe DCS needed to be involved at all and that he had asked the Children's paternal grandparents to come over to the home to watch the Children. *Fact-Finding Hearing Tr. Vol. 2* at 31-32, 36, 46. With respect to Mother's drug use, Father admitted that he knew Mother was using methamphetamine and that she needed assistance and help with her substance use issues. *Id*. at 43-44. Father also admitted that someone other than Mother had to care for the Children if she was using methamphetamine, and when questioned by the juvenile court about a safety plan and who would care for the Children while Father was at work, Father responded that paternal grandparents were only at the home a couple of times a week. *Id.* at 44, 46. After hearing both Father and DCS present evidence regarding the Children's safety and well-being and Father's ability to provide care for the Children in light of Mother's substance use issues and his work schedule, the juvenile court provided its assessment of Father's testimony stating that Father lacked "a

---

[5] We note that the "burden of going forward" with the evidence may shift during the course of a trial. *Redington v. State*, 121 N.E.3d 1053, 1065 (Ind. Ct. App. 2019) (citing *Calumet Motor Sales of Hammond, Inc. v. M.F. Cooper Builders, Inc.*, 140 Ind. App. 624, 221 N.E.2d 438, 441 (1966) ("Once plaintiff-appellee introduced evidence to establish the essential elements of his cause of action, the burden of going forward shifted to the defendant-appellant to introduce evidence if, in its opinion, the evidence produced by plaintiff was not correct.")). As noted, DCS bore the burden to prove by a preponderance of the evidence that the Children were CHINS.

safety plan that insures that the children will have a sober care giver" while Father was at work. *Id.* at 49. The juvenile court added that it was:

> [D]isconcerting to the Court that you would think sir, that your wife, who has admitted to having a substance use issue has asked for help and who has tested positive for illicit substances on several occasions that you somehow would come here and say yeah the kids are okay when I'm with her. Or okay if they're not, my parents come by a couple times a week, thinking that that's sufficient. Because it's not.

*Id*. In light of all the testimony and evidence presented at the fact-finding hearing, we cannot say that Finding 5 improperly shifted the burden to Father.

[22] Father also contends that the findings do not support the judgment because there was no evidence presented that Mother's drug use seriously impaired or endangered the Children. In support, Father cites *In re S.M.*, 45 N.E.3d 1252 (Ind. Ct. App. 2015), *Ad.M. v. Indiana Department of Child Services*, 103 N.E.3d 709, 710 (Ind. Ct. App. 2018), and *C.M. v. Indiana Department of Child Services*, 130 N.E.3d 1149 (Ind. Ct. App. 2019), in which panels of this court reversed CHINS adjudications. Specifically, he argues that DCS did not prove a connection between Mother's drug use and the Children's lack of a sober caregiver.

[23] In *S.M.*, we reversed a CHINS adjudication that was based in part on the mother's use of marijuana while pregnant. 45 N.E.3d at 1253-54. We noted that the mother had a history of sporadic marijuana use and the child was born with marijuana positive meconium, but each drug screen the mother provided

during the CHINS proceedings was negative for illegal substances. *Id.* at 1256. The mother also stopped using marijuana when she realized she was pregnant. *Id.*

[24] In *Ad.M*, we reversed a CHINS determination because "evidence of one parent's use of marijuana and evidence that marijuana ha[d] been found in the family home, without more, does not demonstrate that a child has been seriously endangered for purposes of Indiana Code [s]ection 31-34-1-1." 103 N.E.3d at 713-14.

[25] In *C.M.* we reversed a CHINS adjudication and, citing *Ad.M*, observed that while evidence was presented at the fact-finding hearing that Mother might have used marijuana to self-medicate and may have consumed alcohol in excess, there was no evidence regarding "when, where, or how many times C.M. had seen Mother use marijuana or consume alcohol in excess." 130 N.E.3d at 1157. We also noted that there was "nothing in the record to show that Mother ever used marijuana in C.M.'s presence." *Id.*

[26] We find those cases distinguishable because none of them involved a parent who specifically admitted that the child was CHINS due to the parent's drug use as was the case here, nor do they necessarily require DCS to show that Mother used methamphetamine in the Children's presence or that DCS was

required to remove the Children.[6] As previously noted, Father admitted he knew that Mother used methamphetamine and that Mother could not care for the Children if she was using drugs and that he recognized that Mother needed assistance with substance abuse. *Fact-Finding Tr. Vol. 2* at 35-36, 43-44. Mother's admission that the Children were CHINS due to her ongoing drug use encompasses the element that "the child's physical or mental condition is *seriously impaired* or *seriously endangered*" as required by statue. Ind. Code § 31-34-1-1 (emphasis added); *Appellant's App. Vol. 2* at 34, 120-21; *Appellant's App. Vol. 3* at 130-31. Father did not contest Mother's admission during the fact-finding hearing. We also note that Father had been only "minimally compliant" in the referrals that had been recommended by DCS, as he did not believe he needed such services. *Fact-Finding Hearing Tr. Vol. 2* at 22, 36. The aim of a CHINS inquiry is to determine if a child's circumstances require services that are unlikely to be provided absent court intervention. *Matter of E.Y.*, 126 N.E.3d 872, 877 (Ind. Ct. App. 2019). Therefore, DCS presented sufficient evidence to prove the elements of Indiana Code section 31-34-1-1.

## II. Dispositional Order

Father contends that the trial court abused its discretion by imposing requirements on him in the dispositional order that were unrelated to the

---

[6] We note that, on January 10, 2020, the Children were removed from Mother and Father's care due to Mother's continuing to test positive for drugs and Father's failure to take a court-ordered drug screen because DCS could not ensure that the Children had sober caregivers. *Appellant's App. Vol. III* at 127-28.

behavior or circumstances revealed by the evidence. Following a CHINS determination and a dispositional hearing, the trial court issues a dispositional order that details the plan of care, treatment, or rehabilitation required to address the needs of the Child, which includes the entry of findings and conclusions. *See* Ind. Code §§ 31-34-19-1, 31-34-19-10. "Although the [trial] court has broad discretion in determining what programs and services in which a parent is required to participate, the requirements must relate to some behavior or circumstance that was revealed by the evidence." *In re A.C.*, 905 N.E.2d 456, 464 (Ind. Ct. App. 2009). This court has recognized that forcing unnecessary requirements on parents whose children have been determined to be CHINS can set them up for failure and can result in failed reunification of the family and even the termination of parental rights. *Id.* at 464-65.

[28] Specifically, Father contends that the following requirements of the dispositional order were in violation of his constitutional rights because they were vague and arbitrary and based on boilerplate language:

> f. If a program or programs is/are recommended by the Family Case Manager or other service provider, enroll in that program [sic] a reasonable time, not to exceed thirty (30) days and participate in the program as scheduled by that program without delay or missed appointments. If required to obtain an assessment, arrange to complete that assessment within thirty (30) days.

> . . . .

j. Maintain suitable, safe and stable housing with adequate bedding, functional utilities, adequate supplies of food and food preparation facilities. Keep the family residence in a manner that is structurally sound, sanitary, clean, free from clutter and safe for the children.

k. Secure and maintain a legal and stable source of income, which may include employment, public assistance, Social Security and/or child support payments that are adequate to support all the household members, including the children.

l. Assist in the formulation and implementation of a protection plan which protects the children from abuse or neglect from any person.

m. Ensure that the children are properly clothed, fed and supervised. If they are of school age, ensure the children are properly registered/enrolled in and attending school or provide verification that the children are participating in an approved educational program. Fully cooperate with each child's school regarding any issues concerning that child.

. . . .

o. Not consume any alcohol.

p. Obey the law.

. . . .

t. Complete a psychological evaluation(s) as referred and approved by DCS and successfully complete any recommendations that result from the evaluation(s).

u.  Meet with medical/psychiatric personnel, as directed by the medical/psychiatric personnel and take all prescribed medications as in the doses and frequencies specified in the prescriptions.

. . . .

w.  Meet all the medical and mental health needs of the children in a timely and complete manner.  This includes but is not limited to, following all directions of the nurses/doctors, attending all appointments as scheduled and giving all medications prescribed for the above named children in the prescribed doses at the prescribed times.

. . . .

z.  Provide children with a safe, secure and nurturing environment that is free from abuse and neglect and be an effective caregiver who possesses the necessary skills, knowledge and abilities to provide the children with this type of environment on a long-term basis to provide the children with permanency.

*Appellant's App. Vol. 2* at 122-26.

[29]    DCS maintains that Father has waived his challenges to the dispositional order's requirements on the grounds that they violated his constitutional rights because they are arbitrary and vague and based on boilerplate language by failing to object to the imposition of the requirements on those bases at the dispositional hearing.  We agree with DCS that Father has waived these arguments with respect to the dispositional order.  At the dispositional hearing, Father, who was represented by counsel, stated that he "did not agree" to any

of the predispositional report's requirements and that he generally objected to the parenting assessment, drug use assessment, and psychological evaluation, but he did not object on the bases that he now asserts on appeal. *Dispositional Hearing Tr. Vol. 2* at 10-11. It is axiomatic that an argument cannot be presented for the first time on appeal. *Ind. Bureau of Motor Vehicles v. Gurtner*, 27 N.E.3d 306, 311 (Ind. Ct. App. 2015). *See also Plank v. Cmty. Hosps. of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013) ("[A]ppellate review presupposes that a litigant's arguments have been raised and considered in the trial court."); *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003) ("It is well established, however, that a party on appeal may waive a constitutional claim."). Therefore, Father has waived his arguments concerning the dispositional order.

[30] Waiver notwithstanding, we cannot say that the requirements Father challenges are an abuse of discretion. First, the dispositional order's requirement in paragraph f that Father participate in services recommended by DCS or its service providers reiterates the order's initial requirement that Father participate in treatment and services; it does not provide DCS the authority to create orders as Father contends. *Appellant's App. Vol. 2* at 123. With respect to the requirement in paragraph p that Father obey the law, Father (like all citizens) is already subject to that obligation. As to Father's role in assisting with the formulation and implementation of a protection plan for the Children and protecting the Children from neglect in paragraphs l and z, we note that Father had already helped formulate a safety plan during the meeting held before the

dispositional hearing when it was determined who would be providing care for Children when he was working. *Dispositional Hearing Tr. Vol. 2* at 12-13; *Appellant's App. Vol. 2* at 111-12; *Appellant's App. Vol. 3* at 121-22. Similarly, we do not consider the dispositional order's requirements in paragraphs j, k, m, u, and w to maintain suitable housing and suitable income, ensure that T.L. continues to attend school and to feed, clothe, supervise, and attend to the Children's medical needs, and for Father, who is prescribed Suboxone and Neurontin, to meet with medical/psychiatric personnel to be an abuse of discretion. *Appellant's App. Vol. 2* at 124-25; *Fact-Finding Hearing Tr. Vol. 2* at 33, 46-47. Regarding paragraph p's requirement to refrain from alcohol, we note that while alcohol abuse was not specifically mentioned during the fact-finding, it is related to maintaining sobriety, which was at issue during the proceedings. *Fact-Finding Hearing Tr. Vol. 2* at 48-49. Likewise, the psychological evaluation ordered in paragraph t is linked to a concern about domestic violence charges that were filed against Father but eventually dismissed.[7] *Id.* at 12, 14-16; *Father's Ex.* 1.

[31] Affirmed.

---

[7] We also note that the juvenile court remains involved with the CHINS case and, among other matters, conducts periodic case review and permanency hearings at specified intervals. *See e.g.* Ind. Code § 31-34-21-2 (providing that periodic case review must be conducted at least once every six months); Ind. Code § 31-34-21-7 (specifying that a permanency hearing must be held every twelve months). Moreover, Father may petition the juvenile court to modify the dispositional order in accordance with the procedures set forth in Indiana Code chapter 31-34-23.

Pyle, J., and Tavitas, J., concur.